**GAIL, JOHN D. and John F. CORVELLO, et al, Plaintiffs, v. NEW ENGLAND GAS COMPANY, INC., Defendant; KEVIN BURNS, et al., Plaintiffs, v. SOUTHERN UNION COMPANY dba FALL RIVER GAS AND NEW ENGLAND GAS, Defendants; COLLEEN BIGELOW, et al., Plaintiffs, v. NEW ENGLAND GAS COMPANY, formerly known as FALL RIVER GAS COMPANY, an unincorporated division of SOUTHERN UNION COMPANY, Defendants; SHEILA REIS, et al., Plaintiffs, v. SOUTHERN UNION COMPANY dba FALL RIVER GAS AND NEW ENGLAND GAS, Defendants.**

**C.A. No. 05-221T, C.A. No. 05-274T, C.A. No. 05-370T, C.A. No. 05-522T**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

**460 F. Supp. 2d 314; 2006 U.S. Dist. LEXIS 80802**

**November 3, 2006, Decided**

**SUBSEQUENT HISTORY:** Motion denied by Burns v. S. Union Co., 2006 U.S. Dist. LEXIS 93277 (D.R.I., Dec. 20, 2006)

**COUNSEL:** [**1] For Sheila Reis, Dennis Reis, Ashley Reis, Mildred Pacheco, Gary Souza, Donna Souza, individually and on behalf of her minor children, Stepanie Pezzone, Britney Cordeiro, Jamie Bergeron, individually and on behalf of her minor children, Krista Camara, Ethan Barnett, Alan Trecida, Kim Trecida, individually and on behalf of their minor children, Elaina Trecida, Alan J Trecida, Jr, Lyndsay Trecida, Joseph A Trecida, Plaintiffs: Anthony J. Sbarra, Jr., Campbell, Campbell, Edwards & Conroy, Boston, MA, US.; Russell X Pollock, Campbell, Campbell, Edwards & Conroy, PC, Boston, MA.

For Southern Union Company, dba Fall River Gas Company, New England Gas Company, Defendants: David A. Wollin, John A. Tarantino, Kristen W. Sherman, Adler Pollock & Sheehan P.C., Providence, RI.; Kenneth J. DeMoura, Bingham McCutchen LLP, Boston, MA.

For Colleen Bigelow, Donna Braga, Thomas Paterson, Theresa Picard, Plaintiffs: Brian R. Cunha, Brian Cunha & Associates, East Providence, RI.

Rachel Carvalho, pps LORI A. CARVALHO, mother and next friend of Rachel Carvalho, a minor, Plaintiff, Pro se.

For New England Gas Co, an unincorporated division of SOUTHERN UNION COMPANY, formerly known as Fall [**2] River Gas Company, Defendant: David A. Wollin, Adler Pollock & Sheehan P.C., Providence, RI.

For Kevin R. Burns, Florence J. Burns, Leonard Bouchard, Alice Cambra, Susan Ferreira, Raymond Gagnon, Antonio M. Guilherme, Corrine Gagnon, William Hill, Sr, Joann Hill, Michael Lebeau, Carrie Lebeau, Carol A. Matthews, Karen Oliveira, Richard Rapoza, Lauren Rapoza, Grant R. Schofield, Elizabeth Tokarz-Maciel, Marissa Maciel, ppa. Elizabeth Tokarz-Maciel, mother and Next Friend of Marissa Maciel, a minor, Melanie Creador, Robert Creador, Luis Resendes, Louise Resendes, Luis Resendes, Jr., Linda Resendes, Daniel Schreffler, David A. Tavares, Plaintiffs: Brian R. Cunha, Brian Cunha & Associates, East Providence, RI.

For New England Gas Company, formerly known as Fall River Gas Company, Defendant: Christina C. Dodds, Bishop London Brophy Dodds, P.C., Austin, TX.; David A. Wollin, Adler Pollock & Sheehan P.C., Providence, RI.; Eric D. Herschmann, Kasowitz, Benson, Torres & Friedman, LLP, New York, NY.

For Gail Corvello, John F. Corvello, Linda M. Ferreira, Robert M. Ferreira, Gary Rose, Victor Rose, III, Lorraine Aguiar, Frank J. Aguiar, Jr., Cathleen Alvarnas, Michael A. Alvarnas, [**3] Mary Lou Amaral, Carlos Amaral, Fatima Amaral, Liria Amaral, Bay View Holy Ghost Citizens Club, Debra Beausoleil, Ellen G. Cabral, John Cabral, Susan Correia, Maria I. Amaral, Pedro M.

Amaral, Henry M. Beirola, Jr., Stephen Bigos, Nancy Ann Borden, Robert Borden, Jane Borges, Richard A. Borges, Mark Bouchard, Sara Cabral, William G. Camara, Janice M. Carroll, Junya Cambra, John Cambra, Barry C. Carroll, Karen Chafton, Claywell M. Chafton, III, Kathleen Cristo, John cristo, Carolyn Collins, Normenia Cordeiro, Jose P. Cordeiro, Patricia Aguiar, Isabel M. Correia, Francis R. Correia, Colleen Fernandes, Manuel Cristo, Doris Duarte, Dennis Duarte, John F. Duarte, Estate of Christina Farias, Linda Hair, Barry Hair, Mary Held, Larry A. Held, Pamela A. Klus, Edward J. Klus, Raymond Lepage, Judith Lepage, Victoria Macomber, Michael Macomber, Hilda R., Myron J. Martin, Richard M. Martin, Jean Medeiros, Thomas Medeiros, Linda Mello-Fournier, Eleanor Monast, Michael Monast, Evelyn Morris, Antone Custodio, Lucia Pavao, Dimas Pavao, Manuel Pavao, Odelia Pavao, Cynthia A. Reagan, Debra A. DePaola, Estate of George Oliveria, Lois Scanlon, Stephen J. Scanlon, Michelle Silva, David Silva, Angelina Silvia, [**4] Loree A. Silva, Dana Silva, Dana Silva, John Silva, Barbara Silva, Tobias Silva, Jr., Georgianna Simpson, Alvin B. Simpson, Alvin B. Simpson Revocable Trust, Georgianna Simpson Revocable Trust, Marsha Skarka, Clinton Skarka, Mary Souza, Mary Faria, Virginia Borges, Hilda Martin, Delores Boyle, Daniel J. Terciero, Teresa Farias, Margaret Medeiros, Paul Terceiro, Bruce Thompson, Carolyn Volois, Dennis Volois, Antonio Vieira, Heather Vieira, Betsey D. Warren, Lynne V. Waters, Timothy Waters, Lisa Wilt, Robert Wilt, Jr., John D. Corvello, Shirley M. Cordeiro, Gina Adorno, Jose A. Adorno, Adam Braga, Donna Braga, Jennifer Braga, Pauline Carvalho, Marion Bradshaw Trust, Evelyn Rogers, Ernest Simpson, Norma Simpson, David A. Tavares, Plaintiffs: John J. McConnell, Jr., Robert J. McConnell, Motley Rice LLC, Providence, RI.; Mark W. Roberts, McRoberts, Roberts & Rainer, LLP, Boston, MA.; Neil T. Leifer, Thornton & Naumes, LLP, Boston, MA, US.

For New England Gas Co., Inc, Defendant: Christina C. Dodds, Bishop London Brophy Dodds, P.C., Austin, TX.; David A. Wollin, Adler Pollock & Sheehan P.C., Providence, RI.; Eric D. Herschmann, Kasowitz, Benson, Torres & Friedman, LLP, New York, NY.

[**5] For Department of Environmental*, Defendant: Brian A. Wagner, RI Department of Environmental Management, Office of Legal Services, Providence, RI, U.S.

For Department of Environmental Management, Interested Party: Brian A. Wagner, RI Department of Environmental Management, Office of Legal Services, Providence, RI, U.S.

**JUDGES:** Ernest C. Torres, Chief Judge.

**OPINION BY:** Ernest C. Torres

**OPINION**

[*318] ***MEMORANDUM AND ORDER***

ERNEST C. TORRES, Chief Judge.

The plaintiffs in these four cases reside on and/or own property in Tiverton, Rhode Island. They brought these actions against New England Gas Company ("NE Gas"), an unincorporated division of Southern Union Company ("Southern Union"), alleging that, approximately fifty years ago, hazardous substances that were the by-product of a coal gasification process utilized by Fall River Gas Company ("FRGC"), NE Gas's predecessor, were deposited as fill on the plaintiffs' property.

The multi-count complaints assert claims for negligence, gross negligence, violation of the Rhode Island Hazardous Waste Management Act ("HWMA"), R.I. Gen. Laws § 23-19.1-22, strict liability, infliction of emotional distress, private [**6] nuisance, and public nuisance. The relief sought includes monetary damages for the plaintiffs' loss of use and enjoyment of their properties, for diminution of the properties' value and for emotional distress as well as punitive damages, costs and attorneys' fees. Some of the plaintiffs also are requesting declaratory and/or injunctive relief.

NE Gas and Southern Union have moved, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss all of the plaintiffs' claims. For the reasons hereinafter stated, those motions are granted with respect to the Counts alleging gross negligence, private nuisance, intentional or negligent infliction of emotional harm, and violation of HWMA, but the motions are denied with respect to the Counts alleging negligence, strict liability, and public nuisance. The motions to dismiss also are denied with respect to the punitive damages claims.

***Background Facts***

All four complaints allege essentially the same facts and, with one exception, make identical claims. [1] The facts alleged are as follows.

1 Only the plaintiffs in Corvello assert claims for infliction of emotional distress and for violation of HWMA.

[**7] [*319] At some unspecified time before it was acquired by Southern Union, FRGC operated an electric power-generating facility near the property now owned by the plaintiffs. The facility produced "coal gasification waste material," some of which allegedly was

deposited as fill on or near the plaintiffs' property, apparently by contractors. The Corvello complaint states that the fill was deposited "prior to the construction of homes" in the area. Corvello Compl. P 17.

In August 2002, the Town of Tiverton was installing a sewer interceptor line in an area near the plaintiffs' property. Some of the excavated soil was an unusual blue color and emitted a distinctive odor characteristic of polyaromatic hydrocarbons.

A Rhode Island Department of Environmental Management ("RIDEM") investigator determined that the blue color indicated that the soil was "coal gasification waste material" that contained toxic and hazardous substances and that some of the substances, notably polyaromatic hydrocarbons ("PAH's"), cyanide and naphthalene, exceeded RIDEM's established exposure criteria. Further investigation disclosed the presence of these substances in the soil under the streets in the neighborhood and [**8] on some of the surrounding property.

RIDEM issued a "letter of responsibility" to the defendants and the Town of Tiverton placed an emergency moratorium on excavation in an area that encompasses the plaintiffs' properties. The moratorium precludes the issuance of building permits for any construction requiring excavation.

The plaintiffs in *Corvello, Burns,* and *Bigelow* brought actions in the Rhode Island Superior Court which were removed to this Court. The plaintiffs in *Reis* brought an action in the United States District Court for the District of Massachusetts which was transferred to this Court.

All of the complaints contain claims for negligence, strict liability, private nuisance and public nuisance. The *Corvello* and *Reis* complaints also include claims for gross negligence, and the *Corvello* complaint includes claims for infliction of emotional distress, and violation of the HWMA, R.I. Gen. Laws § 23-19.1-22. [2]

2 The *Burns* complaint originally included a claim for Trespass that was voluntarily dismissed at the December 1, 2005 hearing on the motion to dismiss.

[**9] ***Standard of Review***

In ruling on a motion to dismiss made pursuant to Rule 12(b)(6), the Court takes the well-pleaded allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiffs. *Barrios-Velazquez v. Asociacion De Empleados Del Estado Libre Asociado De Puerto Rico,* 84 F.3d 487, 489-90 (1st Cir. 1996). The motion may be granted only if it appears that the plaintiffs cannot prove any set of facts entitling them to relief. *Rockwell v. Cape Cod Hosp.,* 26 F.3d 254, 255 (1st Cir. 1994). However, the Court need not credit "bald assertions," subjective characterizations or "unsubstantiated conclusions." *Rodi v. Southern New Eng. Sch. Of Law,* 389 F.3d 5, 10 (1st Cir. 2004). Nor may a plaintiff rest on allegations of a "general scenario which could be dominated by unpleaded facts." *Dewey v. Univ. of New Hampshire,* 694 F.2d 1, 3 (1st Cir. 1982).

***Analysis***

I. *Negligence*

A. *Breach of Duty*

The defendants argue that the negligence claims should be dismissed because the complaints do not allege any facts that would establish the violation of a duty [*320] owed by [**10] the defendants to the plaintiffs. More specifically, the defendants argue that they have not breached any duty owed to the plaintiffs because the coal gasification waste material was deposited long before the area in question was developed and, therefore, any alleged harm to the plaintiffs was too remote and speculative to be reasonably foreseeable.

The defendants rely on *Hydro-Manufacturing v. Kayser-Roth Corp.,* 640 A.2d 950, 955 (R.I. 1994) and *Wilson Auto Enters., Inc. v. Mobil Oil Corp.,* 778 F. Supp. 101, 104 (D.R.I. 1991), but that reliance is misplaced. Both cases involved negligence claims against prior owners of the plaintiffs' property for activities that allegedly contaminated the soil and/or ground water. In each case, the Court rejected the claim on the ground that the possibility that a property owner's use of his property might cause injury to future owners was too remote to impose a duty to future purchasers to refrain from such use.

In *Wilson,* the contamination allegedly resulted from the defendant's operation of a gas station on the property. The Court found that allegation insufficient to state a claim because the plaintiffs [**11] had an opportunity to inspect the property before purchasing it and, under the doctrine of *caveat emptor,* they had a responsibility to do so, especially since the property's use as a gas station made the possibility of contamination fairly predictable. *Wilson,* 778 F. Supp. at 105. However, Judge Lagueux suggested that the result might have been different if a claim of contamination had been asserted by owners of nearby property because, unlike the plaintiff in that case, "Mobil's neighbors in Foster may have had no choice in becoming victims of Mobil's alleged chemical leaks." *Id.*

In *Hydro Manufacturing,* the purchaser of property on which the defendant previously had operated a textile plant sought to recover for contamination allegedly

caused by the defendant's negligence in allowing hazardous materials to spill on the ground. The Court affirmed the entry of summary judgment in favor of the defendant holding that prior owners of property do not "owe remote purchasers a duty to maintain the property and to refrain from any activity that may harm the property" because "the duty that sellers owe to subsequent purchasers is established primarily through contracts [**12] between the parties who theoretically reach an arm's-length agreement on a sale price that reflects the true value of the land." *Hydro Manufacturing,* 640 A.2d at 955 (citations omitted). The *Hydro Manufacturing* Court pointed out that a prospective buyer can obtain protection by inspecting the property, obtaining representations or warranties from the seller and seeking indemnity or a reduction in the sale price to reflect the land's actual economic value. *Id.* at 955-56.

This case is distinguishable from *Wilson* and *Hydro Manufacturing* because these plaintiffs are not subsequent purchasers of FRGC's property. Accordingly, these plaintiffs presumably, were not alerted to the possibility that waste generated by FRGC had contaminated their property; and, therefore, they would have had no reason to perform environmental tests before buying the property. Nor did these plaintiffs have any opportunity to bargain with or obtain representations and warranties from FRGC. Rather, the plaintiffs are like the neighbors referred to in *Wilson* who had no choice about becoming victims of the alleged contamination.

In short, the limited *caveat emptor* [**13] exception that precludes contamination claims by a landowner against a previous owner is not applicable in this case and does not relieve the defendants of their duty to refrain from conduct that contaminates or otherwise harms neighboring [*321] properties. *See O'Donnell v. White,* 23 R.I. 318, 50 A. 333 (R.I. 1901) (municipality held liable for negligently throwing earth and gravel on owner's property while filling in streets).

B. *Violation of Section 23-19.1-22*

In addition to their claim for an alleged violation of the Rhode Island Hazardous Waste Management Act, R.I. Gen. Laws § 23-19.1-22 (the "HWMA"), the plaintiffs cite that alleged violation in support of their negligence claim.

Under Rhode Island law, violation of a statute is evidence of negligence. *Wallace v. United States,* 335 F. Supp. 2d 252, 264 (D.R.I. 2004) (citing *Clements v. Tashjoin,* 92 R.I. 308, 168 A.2d 472, 474 (R.I. 1961) and *Sitco v. Jastrzebski,* 27 A.2d 178, 179, 68 R.I. 207 (R.I. 1942)). Consequently, a showing that the defendants caused coal gasification waste to be deposited on the plaintiffs' property in violation of the HWMA may be admissible as [**14] evidence of negligence if the statute was in effect at the time that the defendants acted. [3] Since the complaints fail to state when the coal gasification wastes were deposited on the plaintiffs' property, this Court cannot say that the plaintiffs will be unable to show that the HWMA was in effect at that time.

3 It is possible that actual liability for an alleged violation of the HWMA might be imposed retroactively, *see Charter Int'l Oil Co. v. United States,* 925 F. Supp. 104, 110 (D.R.I. 1996).

II. *Gross Negligence*

With one very limited exception, Rhode Island does not distinguish between degrees of negligence and, therefore, does not recognize a separate cause of action for gross negligence. *Labree v. Major,* 111 R.I. 657, 306 A.2d 808, 816 (R.I. 1973); *Wilson,* 778 F. Supp. at 104. The exception is set forth in the "good samaritan" statute which immunizes emergency medical technicians ("EMTs") from liability for conduct during the performance of their duties unless [**15] they are guilty of gross negligence or willful misconduct. *See* R.I. Gen. Laws § 23-4.1-12.

In support of their gross negligence claims, the plaintiffs cite *Contois v. West Warwick,* 865 A.2d 1019 (R.I. 2004) and *Leite v. City of Providence,* 463 F. Supp. 585, 591 (D.R.I. 1978), but these cases do not support their claims. *Contois* dealt with a negligence action against an EMT and addressed gross negligence only in order to determine whether the EMT was entitled to immunity under the Good Samaritan statute. Moreover, in *Leite,* the gross negligence claim was asserted in connection with a Section 1983 claim under federal law, not a claim based on Rhode Island law.

Consequently, while the plaintiffs might be entitled to recover on the theory that the defendants were negligent, they cannot maintain a separate claim for gross negligence.

III. *Strict Liability*

A defendant who knowingly engages in abnormally dangerous activity or causes an abnormally dangerous condition to exist, may be held liable for any resulting harm to persons or property even if the defendant exercised reasonable care. Restatement (Second) of Torts § 519(1) [**16] (1977).

The Rhode Island Supreme Court has said that "whether a defendant should be held strictly liable for ultra-hazardous or abnormally dangerous activities is a question of law." *Splendorio v. Bilray Demolition Co., Inc.,* 682 A.2d 461, 465 (R.I. 1996). [4] However, it also has stated that [*322] determining whether an activity is ultra-hazardous or abnormally dangerous requires con-

sideration of a variety of factors set forth in the Restatement (Second) of Torts and that "[t]he weight apportioned to each [factor] should be dependent upon the facts in each particular case." *Splendorio,* 682 A.2d at 466. The factors to be considered are:

> "(a) existence of high degree of risk of some harm to the person, land or chattels of others;
>
> "(b) likelihood that the harm that results from it will be great;
>
> "(c) inability to eliminate the risk by the exercise of reasonable care;
>
> "(d) extent to which the activity is not a matter of common usage;
>
> "(e) inappropriateness of the activity to the place where it is carried on; and
>
> "(f) extent to which its value to the community is outweighed by its dangerous attributes."

*Id.* (quoting Restatement (Second) of Torts § 520 [**17] (1977)).

> 4 *Splendorio* overruled *Rose v. Sacouny-Vacuum Corp.,* 54 R.I. 411; 173 A. 627 (1934) which declined to follow the doctrine of strict liability first expressed in *Rylands v. Fletcher.*

Generally, "[a]n activity is not abnormally dangerous if the risks therefrom could be limited by the exercise of reasonable care." *Splendorio,* 682 A.2d at 466 (quoting *G.J. Leasing Co. v. Union Elec. Co.,* 854 F. Supp. 539, 568 (S.D. Ill. 1994)).

The mere fact that an activity involves an ultra-hazardous or abnormally dangerous substance is not, by itself, sufficient to trigger strict liability. As the *Splendorio* Court stated, "if the rule were otherwise, virtually any commercial activity involving substances which are dangerous in the abstract automatically would be deemed as abnormally dangerous. This result would be intolerable." *Splendorio,* 682 A.2d at 465-66 (quoting *G.J. Leasing Co.,* 854 F. Supp. at 568). [**18] Accordingly, the abnormal risk of harm must arise from the manner in which the defendant dealt with a dangerous substance. *Splendorio,* 682 A.2d at 466. Put another way, the substance must be used in a way that creates an unreasonable risk of harm.

In *Splendorio,* the Court upheld the entry of summary judgment in favor of a company hired to develop an abatement plan for any asbestos found in buildings that were being demolished. The plaintiffs claimed that asbestos in the debris removed from the site by the demolition company contaminated their property and that the defendant, as the architect of the plan, was strictly liable. However, the Court found that, even though asbestos may be an abnormally dangerous substance, strict liability did not apply because the task performed by the defendant was not inherently dangerous and its "value to the community . . . far outweighed its dangerous attributes." *Id.* at 466.

In this case, although the determination as to whether the defendants' activities were ultra-hazardous or abnormally dangerous ultimately may be a question of law, that determination cannot be made until evidence is presented with respect [**19] to the facts upon which the determination must be based. At this juncture, the relevant facts are unknown. There is no evidence regarding such matters as exactly what substances were deposited on or near the plaintiffs' property, what role the defendants may have played in depositing them, exactly what dangers the substances pose, whether that danger was recognizable at the time of disposition and whether the danger could have been eliminated by the exercise of reasonable care. Therefore, this Court cannot say that the plaintiffs will be unable to prove any facts that may entitle them to relief on their strict liability claims.

## IV. *The Nuisance Claim*

### A. *Nuisance, in General*

As so aptly stated by the late Professor Prosser, "[t]here is perhaps no more impenetrable [*323] jungle in the entire law than that which surrounds the word 'nuisance'" the application of which too often has demonstrated a tendency "to seize upon a catchword as a substitute for any analysis of a problem." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 86, at 617 (5th ed. 1984) [hereinafter "Prosser"]. The lack of analysis and seeming inconsistency in dealing with nuisance claims stems, [**20] partly, from the historical development of nuisance doctrine; partly, from a failure to clearly define what constitutes a nuisance; and, partly, from differences in describing the kinds of conduct required to support a nuisance claim. *Id.* Much of the uncertainty is rooted in the fact that the causes of action for both private and public nuisance developed on a case-by-case basis, along separate tracks and based on different principles.

Historically, claims for private nuisance have been "narrowly restricted to the invasion of interests in the use or enjoyment of land" caused by a defendant's use of his

own property. *Id.* at 618. By contrast, claims of public nuisance "extend[ed] to virtually any form of annoyance or inconvenience interfering with common public rights." *Id.* Moreover, until recently, an action for public nuisance, generally, could be maintained only by a duly authorized representative of the public. *See id.* § 90, at 643-46.

A great deal of the confusion surrounding present day nuisance law arises from a failure to recognize that "[n]uisance, either public or private, is a field, or rather two distinct fields, of tort liability." Restatement (Second) of Torts § 822 cmt. a [**21] (1979). Fortunately, Rhode Island law generally recognizes the historical distinction between the two types of nuisance claims and also defines "nuisance" as a substantial and unreasonable interference with a plaintiff's protected interests. *Hydro-Manufacturing v. Kayser-Roth Corp.,* 640 A.2d 950, 957 (R.I. 1994).

Under Rhode Island law, "[a] cause of action for private nuisance 'arises from the unreasonable use of one's property that materially interferes with a neighbor's physical comfort or the neighbor's use of his real estate'" and "a public nuisance is an 'unreasonable interference with a right common to the general public.'" *Id.* (quoting *Weida v. Ferry,* 493 A.2d 824, 826 (R.I. 1985)). *See* Restatement (Second) of Torts §§ 821B, 821D (1979). As Prosser states, "[t]he interference with the protected interest must not only be substantial, but it must also be unreasonable." Prosser § 87, at 629.

The conduct giving rise to a nuisance claim may consist of "an act; or a failure to act under circumstances in which the actor is under a duty to take positive action to prevent or abate the . [**22] . . invasion [of the protected interest]." Restatement (Second) of Torts § 824. Liability also may be predicated on the conduct of servants, agents or independent contractors. *Id.* cmt. c.

The critical inquiry in deciding whether an interference with the protected rights of others is "unreasonable" is whether "the gravity of the harm caused outweighs the utility of the conduct," Prosser § 88A, at 630 (5th ed. 1984). *See* Restatement (Second) of Torts § 826 (enumerating the factors to be considered in determining reasonableness). Put another way, a plaintiff must establish that "the harm or risk . . . is greater than he ought to be required to bear under the circumstances." *Citizens for Preservation of Waterman Lake v. Davis,* 420 A.2d 53, 59 (R.I. 1980) (citing Restatement (Second) of Torts, § 822 cmt. g at 112).

[*324] B. *Private Nuisance*

The plaintiffs allege that the disposal of FRGC's coal gasification waste on their property and on nearby properties has created a private nuisance. The defendants argue that the complaints fail to state a claim for [**23] private nuisance because they do not allege that the nuisance resulted from activities conducted on the defendants' property or that the plaintiffs' homes and the defendants' facility are "neighboring" properties. Plaintiffs' Mem. at 12.

As already noted, in order to prevail on their private nuisance claims, the plaintiffs must show that the interference resulted from the defendants' unreasonable use of their own property. *Hydro Manufacturing,* 640 A.2d at 957 (quoting *Weida v. Ferry,* 493 A.2d 824, 826 (R.I. 1985)); *accord Citizens for the Preservation of Waterman Lake,* 420 A.2d at 59. Here, the complaints do not allege that the contamination was caused by FRGC's use of its property. Rather, they allege that the contamination resulted from transporting hazardous material from FRGC's property and depositing it on or near the plaintiffs' property. Consequently, although it seems clear that the alleged interference with the plaintiffs' property interests is of a magnitude that satisfies the requirement of substantial interference, and while the plaintiffs may have viable claims against the defendants under theories of negligence, intentional [**24] tort and/or strict liability, they have failed to state claims for private nuisance.

C. *Public Nuisance*

The plaintiffs allege that the disposal of FRGC's coal gasification waste on their property and on nearby property also has created a public nuisance that harms them. The defendants argue that the complaints fail to state claims upon which relief may be granted because the alleged harm relates only to private properties belonging to the individual plaintiffs and not to any "right common to the general public" as required by *Hydro Manufacturing,* NE Gas Mem. Mot. Dismiss at 14-15.

In order to prevail on a public nuisance claim, a plaintiff must establish that a defendant unreasonably interfered with a "right common to the general public" and that the plaintiff sustained "special damages" as a result of the interference. *Hydro Electric Manufacturing,* 640 A.2d 950, 957-58 (citing *Iafrate v. Ramsden,* 96 R.I. 216, 190 A.2d 473, 476 (R.I. 1963)); *Clark v. Peckham,* 10 R.I. 35 (1871).

A right "common to the general public" is a collective right that is shared by everyone in the community. It differs from a right that is possessed only by certain [**25] individual members of the public. *See* Restatement (Second) of Torts 821B cmt. g. Thus, a public nuisance has been described as something "that unreasonably interferes with the health, safety, peace, comfort or convenience of the general community." *Citizens for Preservation of Waterman Lake,* 420 A.2d at 59.

A public nuisance may consist of an "'aggregation of private injuries [that] becomes so great and extensive as to constitute a public annoyance and inconvenience, and wrong against the community.'" *Sullivan v. Amer. Mfg. Co. of Massachusetts,* 33 F.2d 690, 692 (4th Cir. 1929) (quoting *Wesson v. Washburn Iron Co.,* 95 Mass. 95, 13 Allen 95, 90 Am. Dec. 181 (Mass. 1866)). However, the fact that a condition interferes with the private rights of a substantial number of individuals does not, by itself, make it a public nuisance. *See Iafrate,* 190 A.2d at 476 (a plaintiff must demonstrate that "the acts complained of interfered with any interest of plaintiffs common to the general public.") (quoting Prosser). The distinction is illustrated by Prosser's example of a polluted stream. [*325] The pollution [**26] would be a private nuisance if it interferes only with the use and enjoyment of property belonging to a number of riparian owners but it would be a public nuisance if it kills all of the fish, thereby depriving the public of the right to fish in the stream. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 90, at 645 (5th ed. 1984).

An action for public nuisance may be maintained by a private citizen who "suffers special damage, distinct from that common to the public." *Hydro Manufacturing,* at 957 (quoting *Iafrate v. Ramsden,* 96 R.I. 216, 190 A.2d 473, 476 (1963)). Under Rhode Island law, a private citizen also may bring an action "to abate the nuisance and to perpetually enjoin the person or persons maintaining the nuisance." R. I. Gen. Laws. § 10-1-1.

In order to satisfy the "special damage" requirement, a private plaintiff must show that he has "'suffered harm of a kind different than that suffered by other members of the public exercising the right common to the general public that was the subject of interference.'" *Hydro Manufacturing,* 640 A.2d at 958 (quoting Restatement (Second) of Torts § 821C(1) [**27] ). *See* Prosser § 90, at 646 ("[a] private individual has no action for the invasion of the purely public right, unless his damage is in some way to be distinguished from that sustained by other members of the general public."). Consequently, it is not enough for a private plaintiff to show that he has suffered "the same kind of harm or interference but to a greater extent or degree" as other members of the public. Restatement (Second) of Torts § 821C cmt. b (1979). Rather, the harm shown must be separate and distinct from the harm suffered by the general public. *Hydro Manufacturing,* 640 A.2d at 958.

"Special damages" may include personal injury to the plaintiff, damage to the plaintiff's property or substantial interference with the use and enjoyment of the plaintiff's property; but, in order to be compensable under a public nuisance theory, the damages must have been caused by interference with the public right. *See Hydro Manufacturing,* 640 A.2d at 957-58; Prosser § 90, at 648. Thus, in *Hydro Manufacturing,* the Court rejected a public nuisance claim by a landowner whose property was forfeited under [**28] CERCLA as a result of contamination caused by a prior owner that polluted the groundwater. The Court held that the landowner could not maintain a public nuisance action against the prior owner because the public right interfered with was "the right to pure water" and the landowner "did not allege that it suffered special damages stemming from [the defendant's] interference with [the plaintiff's] use and enjoyment of the ground water at the site or of its right to pure water." *Id.* at 958. The Court noted that the landowner's damages flowed from the forfeiture of its property and "not in the exercise of a public right." *Id.*

In this case, although the complaints do not specifically allege that the coal gasification waste poses a threat to public health or otherwise unreasonably interferes with a right common to the general public; it does allege that the waste contains a number of highly toxic substances and that the presence of those substances has prompted the Town to impose a building moratorium in the area. Consequently, this Court cannot say that the plaintiffs will be unable to prove any facts that would entitle them to relief on their public nuisance claims.

[**29] V. *The Emotional Distress Claim*

The emotional distress claim set forth in the Corvello complaint does not state whether it is a claim for intentional infliction of emotional distress or negligent infliction of emotional distress. That omission [*326] is significant because the elements that must be proven in order to prevail on a claim of intentional infliction of emotional distress differ from the elements that must be proven to prevail on a claim for negligent infliction of emotional distress.

In order to prevail on an *intentional* infliction claim, a plaintiff must prove, among other things, that, (1) the defendant acted with intent to cause emotional distress or with reckless disregard as to whether emotional distress would result and (2) the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Swerdlick v. Koch,* 721 A.2d 849, 863 (R.I. 1998) (quoting Restatement (Second) of Torts § 46 cmt. d, at 73)). By contrast, a *negligent* infliction claim only requires proof [**30] that the defendant acted negligently. *Id.* at 864.

A second distinction is that, in order to prevail on a claim for negligent infliction, a plaintiff must show that (1) he witnessed the incident allegedly causing the distress, and (2) he was threatened with injury by being "in the zone of physical danger" or he is "closely related" to

a person who was seriously injured. *Id.* This requirement reflects courts' reluctance "'to impose potentially unlimited and undeserved liability upon a defendant who is guilty of unintentional conduct.'" *Marchetti v. Parsons,* 638 A.2d 1047, 1050 (R.I. 1994) (quoting *Reilly v. U.S.,* 547 A.2d 894, 897-98 (R.I. 1988)).

Under either theory, a plaintiff also must establish (1) a causal connection between the defendant's conduct and the emotional distress and (2) physical symptoms manifesting the distress which must be linked to the defendant's conduct by medical evidence. *Marchetti v. Parsons,* 638 A.2d at 1052; *see Jalowy v. The Friendly Home, Inc.,* 818 A.2d 698, 710 (R.I. 2003).

At oral argument, counsel stated that the complaint was intended to assert claims for both [**31] intentional and negligent infliction of emotional distress. However, in ruling on a motion to dismiss, this Court must base its decision on the complaint as written and not on what counsel, later, may say was intended.

Applying this test, it seems clear that the Corvello complaint asserts a claim for intentional infliction of emotional distress. It describes the defendants' acts and omissions as "outrageous" and "so extreme in degree as to go beyond all possible bounds of decency." Corvello Compl. P 57. It also alleges that the defendant "knew or was reckless in not knowing that its acts and omissions would inflict emotional distress on the plaintiffs." *Id.* P 58. The allegations address elements that are unique to a cause of action for intentional infliction. Furthermore, the Corvello complaint does not allege that the defendants were negligent or that the plaintiffs are within a zone of physical danger, both of which are elements of a claim for negligent infliction.

The defendants argue that the complaint fails to state a claim for intentional infliction because the fact that the plaintiffs did not own or occupy their properties when the coal gasification waste allegedly was [**32] deposited precludes a finding that the defendants acted with the requisite intent to cause emotional distress *to the plaintiffs.* This Court finds that argument persuasive.

It is well established that intent to cause emotional distress cannot exist in the abstract and, like any other intentional tort, it requires a victim who is the object of the defendant's intentional act. *Lewis v. General Elec. Co.,* 37 F. Supp. 2d 55, 60 (D. Mass. 1999); *Collins v. Olin Corp.,* 418 F. Supp. 2d 34, 56 [*327] (D. Conn. 2006). In *Lewis,* the Court dismissed an intentional infliction of emotional distress claim brought by homeowners against a corporation that allegedly dumped contaminated soil near their properties because there was no indication that the defendants' actions were directed at the plaintiffs. *Lewis,* 37 F. Supp. 2d at 60. In doing so, the Court observed that "[t]he focus of cases 'dealing with intentional infliction of emotional distress has been on the emotional distress of a person against whom the extreme and outrageous conduct was directed.'") (quoting *Nancy P. v. D'Amato,* 401 Mass. 516, 517 N.E.2d 824, 827 (Mass. 1988)). Similarly, [**33] in *Collins,* the Court dismissed a claim of intentional infliction of emotional distress brought by neighboring landowners against a municipality for allowing a wetland to be filled with allegedly contaminated soil because "[t]he plaintiffs were not living at the landfill sites at the time of the dumping; indeed, the area was not developed and their residences were not constructed until after the dumping on that property was long completed." *Collins,* 418 F. Supp. 2d at 56. Accordingly, the *Collins* Court stated that, "it cannot be found as a matter of law that [the municipality] knew or should have known that its actions or omissions would inflict emotional distress on the plaintiffs." *Id.*

In this case, since the complaint indicates that the coal gasification waste was deposited before the Corvello plaintiffs acquired their property, the defendants' actions could not have been intended to cause emotional distress to the Corvello plaintiffs; and, therefore, the plaintiffs cannot prevail on their intentional infliction claim.

The absence of any allegation that the plaintiffs have physical symptoms resulting from their emotional distress also is fatal [**34] to their intentional infliction claim. As already noted, physical manifestations are a *sine qua non* to recovery for intentional infliction of emotional distress and it would be a waste of time, effort and resources to require the defendants to ferret out, via discovery, the absence of facts that have not been in order to move for summary judgment.

Of course, the plaintiffs' inability to prove claims for the torts of intentional or negligent infliction of emotional distress does not necessarily mean that they are precluded from recovering for any emotional distress that they may have suffered. If the plaintiffs succeed on any of their other surviving claims and can demonstrate some other type of injury, they may be entitled to recover consequential damages for emotional distress suffered in connection with that injury.

VI. *The Statutory Violation Claim*

The Corvello complaint asserts a claim for violation of the HWMA based on allegations that the coal gasification waste was disposed of "in a manner or location not authorized by R.I. Gen. Laws § 23-19.1-22 (1956)". Corvello Compl. P 61. The defendants argue that this claim should be dismissed [**35] because the "statute does not create a private right of action." NE Gas Mem. Mot. Dismiss at 19.

The HWMA regulates the manner in which hazardous wastes are transported and disposed of. Section 23-19.1-22(c) of the Act provides:

> The State, by and through the Department of Environmental Management, is a trustee of the air, water, fish, and wildlife of the State. An action brought pursuant to the provisions of this chapter with respect to environmental damage may be brought *by the attorney general or the director of the department of environmental management* in [*328] the name of the state as trustee for those natural resources.

Section 23-19.1-22(c) (emphasis added).

Nothing in the HWMA authorizes a private individual to sue for a violation of the statute. Nor do any of the statutory remedies appear to have any application to private litigants. The statute provides for civil penalties ( § 23-19.1-17); criminal penalties ( § 23-19.1-18); payment of restoration costs ( § 23-19.1-18) and treble damages ( § 23-19.1-22). However, since the "damages" in § 23-19.1-22 appear to refer to damages to the environment and natural resources and, since § 23-19.1-23 creates an [**36] environmental response fund consisting of "any sums as the State may appropriate or sums recovered by any action brought under the authority of this chapter," it seems clear that the General Assembly contemplated that violations would be prosecuted by the State and not by private parties. [5] Indeed, that is how the Rhode Island Supreme Court has construed the HWMA. In an unpublished order, that Court stated:

> We are of the opinion that as matter of law the statute does not provide a private right of action for violation of this act, but only for proceedings to be brought in the name of the Director of the Department of Environmental Management and/or by the Attorney General on behalf of the state.

5 During oral argument, the Court inquired whether counsel wished to have the Court certify this question to the Rhode Island Supreme Court but counsel for both sides declined that invitation.

*Stoutenburgh v. Dierauf,* No. 90-194-Appeal (R.I. Dec. 13, 1990).

Moreover, in *Hotel Assocs., LLC v. HMS Assocs. Ltd. P'shp,* 2004 R.I. Super. LEXIS 44, 2004 W.L. 422812 (R.I. Super. Feb. 20, 2004) [**37] the Rhode Island Superior Court, later, reached the same conclusion. In that case, summary judgment was entered against a landowner who sued, under the HWMA, for damages resulting from contamination of its property allegedly caused by fuel oil left in underground storage tanks by the defendant because the Court found that the HWMA did not confer a private right of action. The Court said:

> [I]t is clear from the language of the HWMA, in its entirety, that the legislature left the HWMA's liability determination and enforcement in the hands of the RIDEM and the Attorney General. This Court finds that language and purpose of the HWMA convey that the legislature did not intend to create a private right of action.

2004 R.I. Super. LEXIS 44, [WL] at 10.

The plaintiffs rely on *Gryguc v. Bendick,* 510 A.2d 937 (R.I. 1986) but that case does not support their contention that a private right of action exists under the HWMA. In *Gryguc,* the Court dismissed a suit brought by neighbors under the HWMA against a hazardous waste treatment facility on the ground that the plaintiffs' property was not within the radius entitling them to contest the issuance of [**38] a permit. The plaintiffs in this case argue that the fact that the case was not dismissed on the ground that the plaintiffs did not have a private cause of action indicates that a private cause of action exists. That argument is too attenuated to be persuasive, especially in light of the subsequent decisions in *Stoutenburgh* and *Hotel Associates.*

VII. *Punitive Damages*

The defendants argue that any claims for punitive damages should be dismissed because the complaints fail to allege that FRGC acted with malice or wickedness. NE Gas Mem. Mot. Dismiss Corvello Compl. at 19.

[*329] It is true that, under Rhode Island law, the standard for awarding punitive damages is a very strict one. Thus, a "party seeking punitive damages has the burden of producing 'evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished.'" *Palmisano v. Toth,* 624 A.2d 314, 318 (R.I. 1993) (quoting *Sherman v. McDermott,* 114 R.I. 107, 329 A.2d 195, 196 (R.I. 1974)). However, while it may be advisable to use those terms where punitive damages [**39] are being claimed, there is nothing magical about the words

themselves. All that is required is that the allegations in a pleading, if proven, be sufficient to support a finding of malice, recklessness or wickedness.

Here, the complaints satisfy that requirement. They allege that the "[c]oal gasification waste material contains lead, arsenic, cyanide and other hazardous substances" (Corvello Compl. P 21); that the defendants "knew or should have known that the hazardous substances . . . would cause harm" (Corvello Compl. P 39); and that the defendants "knew or should have known that there was a high degree of risk associated with the handling, disposal and/or release of the hazardous substances" (Corvello Compl. P 44). Based on those allegations, it is possible that the plaintiffs might be able to prove the degree of culpability necessary to support an award of punitive damages.

It is true, as the defendants suggest, that whether evidence is sufficient to support an award of punitive damages is a question of law for the Court. *Palmisano,* 624 A.2d at 318 (citing *Davet v. Maccarone,* 973 F.2d 22, 27 (1st Cir. 1992)) (court makes "initial determination [**40] whether an award of punitive damages is appropriate in a given case."). However, in most cases, the Court cannot make that determination simply by reading the complaint but, instead, must wait until the evidence is presented. This, clearly, is one of those cases.

***Conclusion***

For all of the foregoing reasons, it is hereby ORDERED that the defendants' motion to dismiss is DENIED with respect to the counts contained in the plaintiffs' complaint that assert claims for negligence, strict liability and public nuisance and with respect to the requests for punitive damages. The motion to dismiss is GRANTED with respect to the counts asserting claims for gross negligence, private nuisance, infliction of emotional distress, and violation of the Hazardous Waste Management Act, R.I. Gen. Laws § 23-19.1-22.

IT IS SO ORDERED:

Ernest C. Torres

Chief Judge

Date: November 3, 2006

LEXSEE 50 A. 333

**JAMES H. O'DONNELL vs. J. ELLIS WHITE, City Treasurer. FARRELL J. MITCHELL vs. J. ELLIS WHITE, City Treasurer..**

**[NO NUMBER IN ORIGINAL]**

**SUPREME COURT OF RHODE ISLAND, PROVIDENCE**

**23 R.I. 318; 50 A. 333; 1901 R.I. LEXIS 136**

**November 8, 1901, Decided**

**PRIOR HISTORY:** [***1] TRESPASS ON THE CASE. The facts are fully stated in the opinion. Heard on demurrers to declarations, and demurrers overruled.

**DISPOSITION:** Demurrer overruled and case remanded.

**HEADNOTES**

(1) *Pleading and Practice. Municipal Corporations. Highways. Liability of Municipality for Injuries to Private Property.*

The same rule of law protecting the right of property in an individual against invasion from another individual protects it from similar aggressions on the part of municipal corporations.

In trespass on the case a declaration charged that "the defendant city through its agents and servants, wholly unmindful of its duty in the premises, . . . while at work for said city on . . . streets, filling in said streets at the premises of the plaintiff, so negligently, wrongfully, and improperly did said work and filling in that they threw large quantities of earth and gravel upon the land of the plaintiff and raised said land above the entrance to his store and dwelling, and covered up his cellar windows, and caused the surface water to flow into his cellar . .: "--

*Held*, on demurrer, that the declaration stated a case, as it was not based upon the failure of the city to discharge any statutory duty devolved upon it, but solely on its common-law liability for the doing of a wrongful act.

Distinguishing *Smith* v. *Tripp*, 13 R.I. 152.

**COUNSEL:** Hugh J. Carroll, for plaintiffs.

Edward W. Blodgett, City Solicitor of Pawtucket, for defendant.

**JUDGES:** Stiness, C. J., Tillinghast and Rogers, JJ.

**OPINION BY:** TILLINGHAST

**OPINION**

[**333] [*318] TILLINGHAST, J. These cases, which are actions of the case for negligence, were tried together, and are before us on the defendant's demurrers to the declarations.

The declaration in the first-named case alleges "that the [*319] defendant city through its servants and agents, wholly unmindful of its duty in the premises and of the rights of the plaintiff, on the days of November, 18 (said days being known of record in the Public Works Department of said city), while at work for said city on Coleman, Sumner and Beecher streets, filling in said streets at and around the premises of the plaintiff, so negligently, wrongfully and improperly did said work and filling in, that they then and there threw and cast large quantities of earth and gravel in and upon the land and premises aforesaid of the plaintiff for several [***2] inches; and did raise said land above the entrances to his store and dwelling; and did cover up his cellar windows and exclude the light and air from said windows; and did cause the surface water to flow into said cellar and store and impede the free use of said premises by the plaintiff, his customers and tenants; and by reason of said water so flowing into said store the plaintiff has been caused great damage to his goods and to his business; and by reason of said water flowing into said cellar, the dwelling of the plaintiff and the tenement in said building have been rendered badly suited for use and occupancy and the health of the plaintiff and of his wife and of his family and his tenants has been injured," etc.

The ground of the defendant's demurrer to this declaration is "that it does not disclose any statutory duty on the part of the city in the premises, to the plaintiff, which the defendant had neglected or refused to perform."

We do not think the demurrer is well founded. The declaration does not purport to be based upon the failure of the city to discharge any statutory duty devolved upon it, but it is based solely on its common-law liability for the doing of the wrongful [***3] act. And, while not skillfully drawn, the declaration alleges in effect that while the defendant's servants and agents were lawfully at work on the streets named, under the direction of the city, they so negligently and improperly performed said work that large quantities of earth, etc., were thrown upon the plaintiff's premises, and large quantities of water caused to flow thereon, to his damage.

[*320] We fail [**334] to see why such a declaration does not state a cause of action against the defendant city. It cannot be seriously contended that the defendant city has any right to invade private property in the manner set out in the declaration, either intentionally or negligently, while prosecuting a public improvement. It has no more right to occupy or appropriate private land outside of the limits of the highway, in making repairs or improvements thereon, than has a private individual to occupy or appropriate the adjoining land of his neighbor while making improvements on his own land. That is to say: "The same rule of law which protects the right of property in an individual against invasion from another individual, must protect it from similar aggressions on the part [***4] of municipal corporations." *City of Aurora* v. *Reed*, 57 Ill. 29. See to the same effect *Wallace* v. *City of Muscatine*, 4 Greene (Iowa), 373. *Inman* v. *Tripp*, 11 R.I. 520, distinctly lays down the same doctrine. If, therefore, the defendant city wrongfully entered upon the property of the plaintiff, or wrongfully or negligently threw earth and gravel upon it, as alleged, it is liable in damages to the plaintiff to the same extent as a private individual would have been for a similar wrong. See Elliott on Roads and Streets, 2d ed. § 40, and cases in note 2.

To hold otherwise would be in effect to permit a city or town, in making or repairing a highway, to take and use private property for public purposes without compensation. For, as said by Durfee, C. J., in *Inman* v. *Tripp, supra*, "Certainly property is taken, to some extent, when its beneficial use is destroyed or impaired in this way, as well as when its owner is directly and formally excluded from its enjoyment." *Hendershott* v. *City of Ottumwa*, 46 Iowa 658, was quite similar to the case before us. There the city, for the purpose [***5] of improving the street, raised the natural grade thereof in front of the plaintiff's lot about twelve feet. The crown of the embankment was made the full width of the street. This could not be done without so depositing the earth that it rolled over upon plaintiff's lots while the work of filling up the street was in progress. The effect of thus [*321] filling the street was that a large quantity of earth was deposited upon the front of plaintiff's lots, and part of his hedge was destroyed. In an action against the city to recover the damages thus done to his lots, it was held that he could recover.

In delivering the opinion of the court, Rothrock, J., said:

"It is well settled that if in making changes in the natural surface of streets, the city is negligent in construction, so that the adjacent lots are injured by reason of such negligence, the city is liable for such injury."

He further said: "It must be admitted in this case that the city had the right to grade the street to the full width for the purpose of public travel; but it had no right to deposit earth upon plaintiff's lots. It is urged that the earth was not deposited upon the lots, but upon the embankment in the [***6] street, and it rolled down upon the lots; and that the injury was an incident necessarily resulting from grading the street in front of plaintiff's lots, which was a proper exercise of a lawful power.

"No one would claim that the city, in making the embankment, had the right to enter upon plaintiff's lots and deposit the earth directly thereon. This, beyond question, would be a trespass. It seems to us the city is equally liable for depositing the earth in the street in such a manner that, without ceasing its motion, it passed at once upon the lots. The only difference is that in one case the earth falls from the cart or wagon perpendicularly, and in the other it descends at an angle. By the law of gravitation the injury is as direct and certain in one case as the other. In both cases it is a direct encroachment upon the soil of the adjacent lots by depositing that upon the earth which was not there before. We have found no case, after diligent search, where it has been held this may be done. On the contrary, many cases recognize a different doctrine."

In *Waldron* v. *Haverhill*, 143 Mass. 582, 10 N.E. 481, the court say that:

"If a city or town, instead of leaving [***7] the duty of keeping the highways in repair to be performed by the officers, and in [*322] the methods provided by the general laws, assumes to perform it by means of agents whom it may direct and control, it may be held responsible for the acts of those agents. The chief grounds of a town's exemption from responsibility for the acts of surveyors of highways, as stated in *Walcott* v. *Swampscott*, 1 Allen 101, and in later cases, are, that their powers and duties are prescribed and regulated by statute, and that, in the performance of these duties, they are independent of the town and cannot be directed or controlled or removed from office by the town, and are not amenable to it for the manner in which they discharge the trust reposed in them by law; nor can the town exercise any right of se-

lecting the servants or agents by whom surveyors shall perform their work. These reasons are not applicable to a case where a town performs the work by means of agents of its own;" citing *Hawks* v. *Charlemont*, 107 Mass. 414; *Deane* v. *Randolph*, 132 Mass. 475; *Sullivan* v. *Holyoke*, 135 Mass. 273; *Tindley* v. *Salem*, 137 Mass. 171, [***8] in support of this doctrine.

*Smith* v. *Tripp, City Treasurer*, 13 R.I. 152, relied on by defendant's counsel in support of his demurrer, is clearly distinguishable from the case before us. In that case the gravamen of the charge was that the defendant had failed to perform its statutory duty to keep the street in question in proper repair, and that by reason of such neglect surface water had been wrongfully allowed to flow [**335] therefrom upon plaintiff's land, to his damage.

The court held, and very properly, that as the plaintiff's case was based upon the failure of the city to discharge a statutory duty, it was not enough to simply state a relation from which a duty might arise under certain circumstances, but that unless the duty necessarily resulted from the relation, the circumstances which gave rise to it must likewise be stated. That is, that in such a case the plaintiff must state how the defendant became bound to use care to prevent injury to the plaintiff.

In the case before us the duty of the defendant city to use due care in the premises necessarily resulted from the relation which it sustained to the plaintiff in connection with the [*323] [***9] doing of its work on said streets; and hence there was no occasion for the plaintiff to set forth how it became bound to use such care. The demurrer is therefore overruled.

The declaration in the second case submitted, namely, that of Farrell J. Mitchell against J. Ellis White, City Treasurer, is substantially similar to that which we have already considered, and hence what we have said in the foregoing opinion is also applicable to that, and the demurrer in that case is also overruled and the cases are each remanded to the Common Pleas Division for further proceedings.

LEXSEE 682 A.2D 461, 466

**Frances M. Splendorio et al. v. Bilray Demolition Co., Inc. et al.**

**No. 94-696-Appeal.**

**SUPREME COURT OF RHODE ISLAND**

**682 A.2d 461; 1996 R.I. LEXIS 229**

**September 12, 1996, Decided**
**September 12, 1996, OPINION FILED**

**PRIOR HISTORY:** [**1] Appeal from Superior Court. Providence County. Needham, J. PC 92-6669.

**COUNSEL:** John Marks, For Plaintiff.

Steven M. Richards/Kristin Rodgers Sullivan, Peter J. McGinn, For Defendant.

**JUDGES:** Weisberger, CJ, Murray, Lederberg, Bourcier, Flanders, JJ., Concurring, BOURCIER, J.

**OPINION BY:** BOURCIER

**OPINION**

[*463] **OPINION**

**Bourcier, Justice.** This case comes before us on appeal after summary judgment and entry of final judgment in favor of Certified Engineering and Testing Co., Inc. (Certified), one of three named defendants in a pending Superior Court civil action for damages. Plaintiffs' claims against the remaining defendants are pending trial in the Superior Court.

**I**

**Facts and Travel**

On September 2, 1988, Certified entered into a contract with the Providence Housing Authority (PHA) whereby Certified was required to inspect for the presence of asbestos in three buildings located in a public-housing development, Hartford Park [1] that were scheduled for demolition. If asbestos was discovered, Certified was then required by its contract to develop a plan for the abatement of the asbestos and, after its removal, to certify its absence in the three buildings. Asbestos was found [**2] in the three buildings, and Certified thereafter developed an abatement plan. As part of that plan, the PHA contracted with D. Dixon Donovan Co. to remove the asbestos. After D. Dixon Donovan Co. removed the asbestos, Certified again inspected the three buildings, and determined from its examination that no asbestos remained. Certified then issued its certification. Shortly thereafter, the PHA contracted with Bilray Demolition Co., Inc. (Bilray), another of the defendants, to demolish the buildings. That demolition contract required Bilray to transport the debris from the demolition site. General Laws 1956 § 23-18.9-5 required Bilray to deliver the debris to a licensed solid waste facility. Bilray, however, in the course of its demolition work transported some of the debris from the buildings to its own wrecking yard, located in the town of Johnston, so that it could crush the debris and resell it as fill. That action was in clear violation of § 23-18.9-5.

1 The three buildings were located at 375 Hartford Avenue, 12 Bodell Street, and 22 Whelan Road.

[**3] In 1990, while the third and final building included in the contract between the PHA and Certified was being demolished by Bilray, Certified, during the course of an inspection being conducted pursuant to a different and separate contract with the PHA, discovered a thin coat of asbestos on some walls it was examining in some different buildings located in the Hartford Park housing development. Certified then decided to reexamine the debris from the three buildings demolished by Bilray, both at the demolition yard and at Bilray's wrecking yard in Johnston, to determine if any of that debris contained any similar thin coats of asbestos. A small amount of asbestos was in fact found. As a result, the debris at both sites was then moistened so as to prevent the dispersal of any asbestos fibers into the air, and the debris that had been transported to the Bilray wrecking yard was then removed to a special waste facility in Indiana. Its having [*464] been placed at Bilray's wrecking yard in the first instance is the catalyst of this litigation.

Frances M. and Anthony J. Splendorio (the Splendorios)live in the vicinity of the Bilray wrecking yard in Johnston. They filed a civil action in the [**4] Supreme Court against Bilray, Certified, and R & T Realty, Inc., the last being the owners of the property on which Bilray's wrecking yard is located. Although the Splendorios' complaint was filed as a class-action complaint, it has never been certified as a class action as required by Rule 23 of the Superior Court Rules of Civil Procedure.

In their complaint, the Splendorios allege, inter alia, that the value of their property has been diminished as a result of the defendants' actions. They contend that they must now disclose to any prospective buyers of their property the possible release of asbestos from Bilray's wrecking yard located in the vicinity of their property. Although the Splendorios have never attempted to market their property, they rely upon an affidavit from Robert Colieci (Colieci), a neighboring homeowner in the vicinity of the wrecking yard who is a licensed realtor, for proof of their diminution of property value claim. In his affidavit Colieci asserts that the potential release of asbestos from Bilray's wrecking yard site has reduced property values in the area and has dissuaded local homeowners from marketing their properties because of their fear of having [**5] to disclose to any prospective purchasers the possible presence of asbestos in or about their properties. He asserts further that the one house that was actually sold following the discovery of the asbestos at the Bilray wrecking yard was sold at a "25% reduction," from the seller's asking price, and that he "reasonably believe[s]" was attributed to the potential presence of asbestos in the neighborhood. That fact however was not disclosed prior to the sale. Moreover, according to Colieci, the one other house that is listed for sale in the neighborhood of Bilray's wrecking yard has not sold for a full year, a condition that he again attributes to the asbestos fear situation. The Splendorios' claim for damages is based solely upon Colieci's affidavit.

In responding to the Splendorios' complaint, Certified, one of the three named defendants in the civil action, moved for summary judgment on counts 1 and 4 in the Splendorios' complaint. Those counts allege absolute liability and negligence on the part of all defendants, including Certified. The trial justice after hearing on Certified's summary judgment motion found that the Splendorios had no cause of action against Certified. He [**6] found, specifically, that Certified was not subject to absolute liability pursuant to Rose v. Socony-Vacuum Corp., 54 R.I. 411, 173 A. 627 (1934). He also found that Certified could not be held liable on the negligence theory advanced by the Splendorios because Certified owed no legal duty to the Splendorios and that in order for a duty to exist, the risk of harm to the Splendorios had to be foreseeable to them. The trial justice concluded that the risk of any harm coming to the Splendorios' property from any actions taken by Certified from which any duty flowed to the plaintiffs was not foreseeable. We affirm the trial justice's decision.

In doing so, we note that the trial justice properly adhered to the rule of precedent in relying upon Rose and its rejection of absolute liability as espoused in Rylands v. Fletcher, L.R. 3 H.L. 330. [2]

> 2 Neither Rose v. Socony-Vacuum Corp., 54 R.I. 411, 173 A. 627 (1934) nor Rylands v. Fletcher, L.R. 3 H.L. 330 used the terms "ultra-hazardous activities" or "abnormally dangerous activities." Those terms were coined in the Restatement Torts §§ 519-20 (1938) and the Restatement (Second) Torts §§ 519-20 (1977), respectively. Although the theory was originally developed in Rylands, courts now use the same terms as the Restatements when discussing the absolute liability theory. Coincidentally, counsel for Rose, William A. Needham, Esquire, who advocated the Restatement view happened to be the late uncle of the trial justice.

[**7] Understandably, Rose is bound to resurface at center stage in the pending Superior Court trials of the remaining defendants. We deem it incumbent therefore at this time to provide guidance to the trial justice in that regard. [3]

> 3 The subsurface considerations in Rose would logically be applicable to above surface situations such as are present in the instant pending Superior Court case.

[*465] Factually, Rose involved a claim for damages by Rose against a neighboring oil refinery arising from the refinery's contamination and pollution of subsurface waters under its land. The refinery's contaminated and polluted subsurface waters had seeped under an adjoining refinery roadway and then into the water supply on Rose's nearby land that was used by Rose not only for domestic purposes but also for his farm business that included a piggery and hennery. Despite proving contamination of his subsurface waters and that he had to obtain water from other sources for his domestic wants and that he had lost [**8] 136 hogs and 700 hens, and thereby the ability to continue at his farm business, this Supreme Court in 1934 disposed of his claim by stating:

> "It will be observed that in jurisdictions, holding that even though there is no negligence there is liability for the pollution of subterranean waters, the predominating economic interest is agricultural.

"Defendant's refinery is located at the head of Narragansett Bay, a natural waterway for commerce. This plant is situated in the heart of a region highly developed industrially. Here it prepares for use and distributes a product which has become one of the prime necessities of modern life. It is an unavoidable incident of the growth of population and its segregation in restricted areas that individual rights recognized in a sparsely settled State have to be surrendered for the benefit of the community as it develops and expands. If, in the process of refining petroleum, injury is occasioned to those in the vicinity, not through negligence or lack of skill or the invasion of a recognized legal right, but by the contamination of percolating waters whose courses are not known, we think that public policy justifies a determination that such [**9] injury is *damnum absque injuria.*" Rose, 54 R.I. at 421, 173 A. at 631-32. [4]

4 That discreet Latin phrase or legalese coup de grace simply means that Rose's losses did not give rise to an action for damages against the oil refinery that had killed his livestock and contaminated and polluted his farm water supply. Apparently by rejecting his claim in sophisticated Latin, the Court may have assumed that Rose would not really understand why he lost his case and losing would then not be so painful to him.

We believe that Rose has succumbed to "the inaudible and noiseless foot of Time." [5] The pull of past precedent, should not propel us into creating small distinctions in an effort to follow precedent, and in the end, result in perverting the once intended and true meaning of that precedent. As Justice Holmes observed in his treatise, "precedents should be overruled when they become inconsistent with present conditions." Oliver Wendell Holmes, Jr., The Common Law 126 (1881). Rose is [**10] today inconsistent with present conditions. It has served us long and well, and we lay it now to final rest, holding its teachings no longer applicable in our law. Its demise does not, however, assist the plaintiffs. Under any theory of absolute liability for ultrahazardous or abnormally dangerous activities, Certified could not be found liable to the plaintiffs under the particular facts present in this case. Those facts mandate affirmance of the trial justice's grant of summary judgment under either Rose or the application of an absolute liability theory.

5 William Shakespeare, All's Well That Ends Well, act V, sc. 3.

**II**

**The Absolute Liability Count**

In reviewing the grant of a summary judgment motion, this Court employs the same standard on review as the trial justice. We must examine all of the pleadings, memoranda and affidavits in the "light most favorable to the party opposing the motion." Rustigian v. Celona, 478 A.2d 187, 190 (R.I. 1984). See also Boland v. Town of Tiverton, [**11] 670 A.2d 1245, 1248 (R.I. 1996).

The question of whether a defendant should be held strictly liable for ultrahazardous or abnormally dangerous activities is a question of law. Indiana Harbor Belt Railroad Co. v. American Cyanamid Co., 916 F.2d 1174 (7th Cir. 1990); Perez v. Southern Pacific Transportation Co., 180 Ariz. 187, 883 P.2d 424 (1993). Absolute liability attaches only to ultrahazardous or abnormally [*466] dangerous activities and not to ultrahazardous or abnormally dangerous materials. G.J. Leasing Co. v. Union Electric Co., 854 F. Supp. 539, 567-69 (S.D. Ill. 1994). See also Perez, 180 Ariz. at 189, 883 P.2d at 426 ("in such an analysis properties of the particular substance are not determinative, rather the defendant's activity as a whole is analyzed"). "If the rule were otherwise, virtually any commercial activity involving substances which are dangerous in the abstract automatically would be deemed as abnormally dangerous. This result would be intolerable." G.J. Leasing Co., 854 F. Supp. at 568 (quoting City of Bloomington, Ind. v. Westinghouse Electric Corp., 891 F.2d 611, 615-17 (7th Cir. 1989)).

Although asbestos is understandably an ultrahazardous [**12] or abnormally dangerous material, Certified's activities in this case were not ultrahazardous or abnormally dangerous. An analysis of whether an activity is ultrahazardous or abnormally dangerous requires a consideration of the following factors, as set forth in the Restatement (Second) Torts § 520 (1977):

"(a) existence of high degree of risk of some harm to the person, land or chattels of others;

"(b) likelihood that the harm that results from it will be great;

"(c) inability to eliminate the risk by the exercise of reasonable care;

"(d) extent to which the activity is not a matter of common usage;

"(e) inappropriateness of the activity to the place where it is carried on; and

"(f) extent to which its value to the community is outweighed by its dangerous attributes."

Those factors are to be viewed as a whole and the weight apportioned to each should be dependent upon the facts in each particular case. Perez, 180 Ariz. at 188-89, 883 P.2d at 426. In this appeal, while we recognize that great harm might result from ingestion of asbestos fibers, the risk thereof resulting from Certified's limited activities, leaves that probability on the facts here, most [**13] improbable because its activities were in fact carried out safely and with the exercise of reasonable care. "An activity is not abnormally dangerous if the risks therefrom could be limited by the exercise of reasonable care." G.J. Leasing Co., 854 F. Supp. at 568. Cf. Ganton Technologies, Inc. v. Quadion Corp., 834 F. Supp. 1018, 1020 (N.D.Ill.E.D. 1993)("clean up of PCB's from an industrial site is not an abnormally dangerous activity that warrants the application of strict liability"). Certified's activities in this case were appropriate because in the demolition of buildings possibly containing asbestos it is necessary prior to demolition to inspect for asbestos in order to reduce potential health risks. Nothing required to be performed by Certified created or gave rise to the conditions complained of by the Splendorios. It was Bilray's unanticipated and unlawful actions that created the conditions complained of by them. Finally, and perhaps most importantly, the value to the community of Certified's activities far outweighed its dangerous attributes. "Cleanup operations serve the valuable and essential social function of reducing the danger" of potentially harmful substances [**14] such as asbestos. Id. at 1021. Therefore, public policy, as well as the other factors listed in Restatement (Second) Torts § 520, support our conclusion that Certified could not on the facts present in this case be held strictly liable for its activities. Accordingly, Certified is not liable under the theory of strict liability to the Splendorios and the grant of Certified's motion for summary judgment was proper.

### III

### The Negligence Count

Before there could be any finding of negligence made against Certified, the Splendorios were first required to establish that (a) Certified owed them a legal duty to refrain from negligent activities; (b) that there was a breach of that duty; (c) that the breach proximately caused the Splendorios' injury; and (d) that there was actual loss or damage resulting. See Jenard v. Halpin, 567 A.2d 368, 370 (R.I. 1989). The linchpin in determining the existence of any duty owed to the Splendorios was the foreseeability of the risk of injury to them by Certified's actions. See Banks v. Bowen's Landing [*467] Corp., 522 A.2d 1222, 1225 (R.I. 1987). "The 'risk reasonably to be perceived defines the duty to be obeyed, and risk imports [**15] relation; it is risk to another or to others within the range of apprehension * * *.'" Builders Specialty Co. v. Goulet, 639 A.2d 59, 60 (R.I. 1994)(quoting Palsgraf v. Long Island Railroad Co., 248 N.Y. 339, 344, 162 N.E. 99, 100 (1928)).

It is clear that Certified did not owe the Splendorios any duty. Its contractual obligation from which any duty emanated was to the PHA. Certified could not foresee any risk flowing to the Splendorios because it was not reasonably foreseeable that Bilray would transport any of the demolition debris to its wrecking yard in Johnston, contrary to the terms of its contract with PHA, and to the dictates of the law, and thereby create a risk to the Splendorios. Pursuant to § 23-18.9-5, Bilray was required to deposit the demolition solid waste debris at a licensed solid waste facility. Bilray did not, however, obey that law. Certified cannot be held responsible for its not predicting and anticipating Bilray's breach of contract and illegal actions. Therefore, we are satisfied on the facts in this case that Certified did not owe any duty to the Splendorios, who were clearly outside the zone of any foreseeable danger created by Certified's [**16] activities under its contract with the PHA. In addition to the Splendorios' failure to establish any legal duty owed to them by Certified, the Splendorios have also failed to demonstrate any proximate cause between Certified's inspection actions and the Splendorios' alleged damages. Ordinarily the determination of proximate cause and, consequently, the existence of any superseding cause is a question of fact that should not be decided by summary judgment. However, one resisting summary judgment must assert "sufficient facts to satisfy the necessary elements of his [or her] negligence claim" and if a "plaintiff fails to present evidence identifying defendants' negligence as the proximate cause of his [or her] injury or from which a reasonable inference of proximate cause may be drawn," then summary judgment becomes proper. Russian v. Life-Cap Tire Services, Inc., 608 A.2d 1145, 1147 (R.I. 1992). On the record before us, there were insufficient facts alleged and presented to the trial justice to establish proximate cause between the inspection and certification activities of Certified and the alleged harm and damages to the Splendorios. The facts presented did not permit even [**17] an inference of proximate cause. The record demonstrates that it was Bilray's unforeseeable and illegal superseding act of depositing the demolition materials at its company wrecking yard that proximately caused the Splendorios' alleged harm and damages, thereby cutting off Certified's liability. Since Certified owed no legal duty to the Splendorios and because there was an insufficient showing of proximate cause between Certified's activities and the Splen-

dorios' alleged harm and damages, summary judgment was properly granted in favor of Certified.

In addition to the Splendorios' failure to demonstrate the existence of any legal duty owed to them by Certified or a showing that their alleged damages were the proximate result of Certified's actions, it appears also questionable whether the Splendorios have demonstrated any actual loss or damages that would be sufficient to support any finding of negligence. However, in light of our above conclusions on the issues of legal duty and proximate causation, we need not address the issue of the Splendorios' alleged damages.

Accordingly, the summary judgment is affirmed, the Splendorios' appeal is denied and dismissed, and the papers of [**18] this case are remanded to the Superior Court.

LEXSEE 640 A.2D 950, 955

**Hydro-Manufacturing, Inc. v. Kayser-Roth Corp.**

**No. 93-96-Appeal.**

**SUPREME COURT OF RHODE ISLAND**

**640 A.2d 950; 1994 R.I. LEXIS 124; 39 ERC (BNA) 1236**

**April 19, 1994, Decided**
**April 19, 1994, Filed**

**PRIOR HISTORY:** [**1] Appeal from Superior Court. Providence County. (PC 91-1947). Needham, J.

**DISPOSITION:** The judgment appealed from is affirmed.

**COUNSEL:** Haig Barsamian, Providence, William Grande, Providence, for plaintiff.

Deming Sherman (Edwards & Angell), Providence, Stephen Prignano (Edwards & Angell), Providence, for defendant.

**JUDGES:** Weisberger, Murray, Shea, Lederberg, JJ., Concurring

**OPINION BY:** LEDERBERG

**OPINION**

[*952] OPINION

LEDERBERG, J. The plaintiff, Hydro-Manufacturing, Inc. (Hydro), appealed to the Supreme Court from an order that granted summary judgment to the defendant, Kayser-Roth Corp. (Kayser-Roth). Hydro had purchased a textile-manufacturing facility located in North Smithfield, Rhode Island (the site). Approximately twelve years before Hydro purchased this facility, the site was contaminated with trichloroethylene (TCE). The property at that time was owned by Stamina Mills, Inc. (Stamina), then a subsidiary of a corporation whose successor is Kayser-Roth. Hydro attempted to recover damages it incurred in the aftermath of the site's contamination by asserting several causes of action against its predecessor-in-interest, Kayser-Roth. For the reasons herein stated, we hold that, under Rhode Island law, Hydro may not maintain a claim [**2] against Kayser-Roth. Rather, in this case, the issues of liability, transfer or release from financial responsibility, and actions for allocation, contribution, and recovery of costs for removal or remedial actions, generally, are actionable under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.A. §§ 9601-9675 (West 1983 & Supp. 1993). The facts pertinent to this appeal follow.

FACTS AND PROCEDURAL HISTORY

Since the 1800s a mill building has existed at the site, located north of the Branch River in North Smithfield. Stamina owned and operated a textile-manufacturing facility at the site from 1952 until 1975. In its operations Stamina initially utilized a soap-scouring system to remove dirt and oil from newly woven fabric, but in March 1969, in order to mitigate pollution to the Branch River allegedly caused by the soap-scouring system, Stamina replaced that process with one using TCE. The TCE, however, proved to be no less a contaminant than the soap. Shortly after Stamina began using TCE in 1969, an [*953] indeterminate amount of the chemical was accidentally released into the ground when a tanker driver improperly [**3] attached a hose coupling to the TCE storage tank on the property.

In 1979 the Rhode Island Department of Health began to investigate contamination in residential wells located north and northwest of the site, and in 1980, the Rhode Island Department of Environmental Management (DEM) issued a report that concluded that the residential wells had been contaminated with TCE that had originated from the site. The United States Environmental Protection Agency (EPA) conducted a hydrogeological study of the area and, in September 1982, also concluded that the site was the source of the contamination of the well water. The EPA initiated remedial measures at both the site and the residential, off-site wells.

Between the TCE spill in 1969 and the EPA's study in 1982, the site had twice changed ownership. Stamina, after ending operations at the site in 1975, sold the land in 1976 to Roger Meunier, and in 1977, dissolved its corporate existence. In 1981 Roger Meunier deeded the property to Hydro.

Subsequently, to recover cleanup costs it had incurred, the United States brought suit against Hydro, the current owner of the site, and against Kayser-Roth, the "owner" and "operator" of the site at [**4] the time the contamination occurred. *United States v. Kayser-Roth Corp.,* 724 F. Supp. 15, 23-24 (D.R.I. 1989), *aff'd,* 910 F.2d 24 (1st Cir. 1990), *cert. denied,* 498 U.S. 1084, 111 S. Ct. 957, 112 L. Ed. 2d 1045 (1991). Suit was commenced under CERCLA pursuant to 42 U.S.C.A. § 9607(a)(West Supp. 1993), which provides in pertinent part:

> "(1) the owner and operator of * * * a facility [and]
>
> "(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> * * *
>
> "(4) * * * shall be liable for --
>
> > (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan."

Hydro, prior to trial, entered into a consent agreement in which, in exchange for release from any further liability, it agreed to transfer title of the site to the government, and to pay property taxes during the cleanup, following which Hydro would assume the expense of procuring [**5] a buyer for the site.

Kayser-Roth, having stipulated that TCE is a hazardous material under CERCLA and that a TCE spill had occurred at the site in 1969, nevertheless maintained that it was not liable to the government for the actions of Stamina, and that even if it were liable, the contamination of the wells was not the result of the 1969 spill. Kayser-Roth, however, was classified as "owner" and "operator" of the site for CERCLA purposes within the provisions of § 9607(a) in *Kayser-Roth Corp.*, 724 F. Supp. at 23-24, where the court found "ample evidence to support the fact that once dumped on Stamina Mills' property the TCE migrated to the Forestdale wells." Id. at 24. Accordingly, Kayser-Roth was held liable for cleanup costs amounting to $ 846,492.33 (plus interest) in addition to future response costs for the cleanup both on site and off site. Id. at 24-25.

Within two years of the adverse decision in federal court, Kayser-Roth was again defending a suit stemming from the contamination at the site. Hydro, in March 1991, filed the instant action against Kayser-Roth in Rhode Island Superior Court, [**6] seeking, *inter alia,* indemnification for the damages it suffered as a result of the CERCLA suit. More precisely, Hydro contended that as an innocent purchaser, it was entitled to recover from Kayser-Roth -- the party responsible for the damage -- the value of the land forfeited to the United States, as well as the costs incurred in defending the CERCLA suit. Initially Hydro's complaint consisted of one count sounding in negligence. Hydro subsequently filed an amended complaint advancing six additional theories of recovery including private and public nuisance, abnormally dangerous activity, failure to disclose, and two claims under G.L. 1956 (1991 Reenactment) § 46-12-21, a statute on liability for [*954] pollution of groundwater. Kayser-Roth moved for summary judgment on all seven counts, arguing that no genuine issues of material fact existed and that Kayser-Roth was entitled to judgment as a matter of law. The trial justice found that there were no genuine issues in regard to material facts and, relying primarily on *Wilson Auto Enterprises, Inc. v. Mobil Oil Corp.,* 778 F. Supp. 101 (D.R.I. 1991), held that Kayser-Roth was entitled to judgment as a matter [**7] of law. Hydro filed a timely appeal from the summary-judgment order pursuant to G.L. 1956 (1985 Reenactment) § 9-24-1.

This court reviews the propriety of a summary-judgment order according to the same standards that the trial justice applies in deciding whether to grant a party's motion. *McPhillips v. Zayre Corp.,* 582 A.2d 747, 749 (R.I. 1990). Under Rule 56 of the Superior Court Rules of Civil Procedure, a trial justice may grant summary judgment in favor of a moving party if the justice has determined that there are no genuine issues as to material facts. *Palmisciano v. Burrillville Racing Association,* 603 A.2d 317, 320 (R.I. 1992). As a remedy, summary judgment is extreme and must be applied cautiously. *Golderese v. Suburban Land Co.,* 590 A.2d 395, 397 (R.I. 1991). The trial justice looks to "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," submitted by the parties. Rule 56(c). A party that opposes a motion for summary judgment, however, cannot rely solely on mere

allegations or on the denials contained in the pleadings [**8] to defeat the motion. *Ludwig v. Kowal,* 419 A.2d 297, 301 (R.I. 1980). Rather, the nonmoving party must affirmatively assert facts that raise a genuine issue to be resolved. *Volino v. General Dynamics,* 539 A.2d 531, 533 (R.I. 1988); *Ludwig,* 419 A.2d at 301. If the trial justice has determined that there is no genuine issue of material fact, then the justice must consider whether the moving party is entitled to judgment as a matter of law. *Alfano v. Landers,* 585 A.2d 651, 652 (R.I. 1991).

On appeal Hydro maintained that in relying on *Wilson Auto Enterprises* to grant judgment in favor of Kayser-Roth, the trial justice erred. According to Hydro, there were genuine issues of material fact that foreclosed summary judgment. Our review of the record, however, discloses that none of Hydro's claims raises a genuine issue of material fact. Thus, we look to the various theories set forth in Hydro's amended complaint to determine whether Kayser-Roth is entitled to judgment as a matter of law.

SECTION 46-12-21

In two of the seven counts in its amended complaint, Hydro [**9] relied on G.L. 1956 (1991 Reenactment) § 46-12-21 to support its contention that Kayser-Roth was liable for intentionally and negligently polluting the site and groundwater.

Section 46-12-21 provides:

> "Any person who shall negligently or intentionally pollute groundwater shall be liable to any other person who is damaged by that pollution."

This provision, however, was enacted in 1980, *see* P.L. 1980, ch. 239, § 3, [1] four years after Kayser-Roth's subsidiary sold the property and eleven years after the TCE spill that had caused the groundwater pollution. Hydro contended that the retroactive application of § 46-12-21 permitted Hydro to pursue recovery under the statute. Hydro averred that whether a statute should be applied retrospectively or prospectively rests on the determination of legislative intent. Hydro argued that because increased public support for safeguarding the environment has resulted in national and state policies to abate pollution, the retroactive application of § 46-12-21 would be justified to effectively carry out its legislative intent.

UNKNOWN

[**10] It is well established, however, that statutes and their amendments are presumed to apply prospectively. *Lawrence v. Anheuser-Busch, Inc.,* 523 A.2d 864, 869 (R.I. 1987). Only when "it appears by clear, strong language or by necessary implication that the [*955] Legislature intended" a statute to have retroactive application will the courts apply it retrospectively. *VanMarter v. Royal Indemnity Co.,* 556 A.2d 41, 44 (R.I. 1989). With respect to § 46-12-21, we find neither statutory language nor legislative intent to apply the statute retroactively. On the contrary, the Legislature expressly stated that the law "shall take effect upon passage." P.L. 1980, ch. 239, § 4. *See VanMarter,* 556 A.2d at 44. Therefore, absent any evidence to support the retroactive application of § 46-12-21, the statute must be applied prospectively. Consequently, Hydro's contention that Kayser-Roth is liable pursuant to § 46-12-21 [2] must fail.

1 The Legislature originally codified this provision at G.L. 1956 (1980 Reenactment) § 46-12-30, as amended by P.L. 1980, ch. 239, § 3. Subsequently, this provision was recodified at § 46-12-21. P.L. 1983, ch. 149, § 1. The substance of the statute, however, has remained the same.

[**11]

2 We note that the "progressive" industrial-age law in effect at the time of the TCE spill was an environmentally insensitive statute, G.L. 1956 § 46-12-30. Repealed in 1980 and replaced by the current liability provision, see P.L. 1980, ch. 239, §§ 2-3, the former statute mandated that "no person shall be held to have violated [chapter 12 of title 46] where the sole damage caused by him is the rendering unsuitable for drinking purposes * * * the waters polluted by him." G.L. 1956 § 46-12-30.

NEGLIGENCE

In addition to its statutory claim, Hydro has also relied on tort and equitable theories to support its claim for damages against Kayser-Roth. Hydro asserted that Kayser-Roth's negligent activities at the site resulted in contamination of the land. Hydro argued that Kayser-Roth should be held liable for its negligent acts -- acts that forced Hydro to incur expenses in defense of a CERCLA suit and eventually to forfeit the site in satisfaction of CERCLA cleanup costs. In granting Kayser-Roth's motion for summary judgment, the trial justice rejected the allegation that a prior owner owed a duty [**12] to subsequent and/or remote purchasers and found that the doctrine of caveat emptor controlled the parties relationship. We agree.

Only when an individual owes a duty to another and has breached that duty can that individual be held liable for negligence. *Rodrigues v. Miriam Hospital,* 623 A.2d

456, 460 (R.I. 1993); *Paquin v. Tillinghast,* 517 A.2d 246, 248 (R.I. 1986); *Welsh Manufacturing, Division of Textron, Inc. v. Pinkerton's, Inc.,* 474 A.2d 436, 440 (R.I. 1984). The existence -- or nonexistence -- of a duty is prerequisite to a finding of liability in tort law. *Swajian v. General Motors Corp.,* 559 A.2d 1041, 1046 (R.I. 1989). Without breach of a duty, no liability can be imposed. *Paquin,* 517 A.2d at 248. Thus, critical to every negligence action is the identification of a duty running from the defendant to the plaintiff. *Rodrigues,* 623 A.2d at 460; *Welsh Manufacturing,* 474 A.2d at 440. Whether such a duty exists is a question of law for the court. *Banks v. Bowen's Landing Corp.,* 522 A.2d 1222, 1224 (R.I. 1987); [**13] *Barratt v. Burlingham,* 492 A.2d 1219, 1222 (R.I. 1985).

Hydro, in the instant action, essentially argued that prior owners of property owe remote purchasers a duty to maintain the property and to refrain from any activity that may harm the property. The common law, however, does not support the imposition of such a duty. *Wilson Auto Enterprises, Inc.,* 778 F. Supp. at 104; *Wellesley Hills Realty Trust v. Mobil Oil Corp.,* 747 F. Supp. 93, 100 (D.Mass. 1990). We are of the opinion that any extension of the common law that would impose such a duty is unwarranted in the instant case. We therefore decline to create such a common-law remedy where none exists.

In reaching this conclusion, we note that the duty that sellers owe to subsequent purchasers is established primarily through contracts between the parties who theoretically reach an arms-length agreement on a sale price that reflects the true value of land. *Philadelphia Electric Co. v. Hercules, Inc.,* 762 F.2d 303, 312 (3d Cir.), *cert. denied,* 474 U.S. 980, 106 S. Ct. 384, 88 L. Ed. 2d 337 (1985); [**14] *Wilson Auto Enterprises, Inc.,* 778 F. Supp. at 105. A buyer has the option to inspect the property and inquire into possible defects prior to purchase. A seller who does not answer truthfully is liable in an action for misrepresentation. A buyer concerned with the truthfulness of the seller's answer or of possible future liability resulting from a prior owner's actions can seek a reduction in the sale price, seek indemnity from the seller (through a warranty), [*956] or walk away from the sale. A buyer, then, under an affirmative duty to inspect the land and make reasonable inquiry, can negotiate a selling price that reflects the land's actual, economic value. 778 F. Supp. at 104-05. Under the doctrine of caveat emptor, which has long dominated real estate transactions in Rhode Island, [3] id., the liability of the seller can thus be limited by the terms expressed in the agreement between the parties, *Philadelphia Electric Co.,* 762 F.2d at 312. Buyers of contaminated land, unlike the victims of negligent acts, are in a position to protect themselves through contract or by refusing to conclude a transaction. [**15] For example, in the instant case, Hydro alleged in its complaint that the DEM issued a report on February 1, 1980, connecting the pollution of the residential wells to the TCE spill that had occurred at the site. Hydro also admitted in its complaint that it purchased the site in 1981. Thus at the time Hydro negotiated the purchase agreement, an official association had been recognized between the pollution of the wells and the site. No evidence exists, however, to show that Hydro made an inquiry that could have led to a reduction of purchase price and/or warranties that could have better allocated liabilities. Although agreements to indemnify or hold harmless are unenforceable against the government, CERCLA expressly preserves the right of private parties to contractually transfer to or release another from financial responsibility stemming from CERCLA liability. 42 U.S.C.A. § 9607(e)(1)(West 1983); *Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86, 89 (3d Cir. 1988), *cert. denied,* 488 U.S. 1029, 109 S. Ct. 837, 102 L. Ed. 2d 969 (1989); *Southland Corp.* v. *Ashland Oil, Inc.,* 696 F. Supp. 994, 1000 (D.N.J. 1988). [**16]

> 3 Certain exceptions to the doctrine of caveat emptor have developed based on equitable principles. *See e.g., Graham v. United States,* 441 F. Supp. 741, 743 (N.D. Tex. 1977)(duty to disclose dangerous conditions known to vendor); *Padula v. J. J. Deb-Cin Homes, Inc.,* 111 R.I. 29, 32, 298 A.2d 529, 531 (1973)("where a builder-vendor sells a house * * * he implicitly warrants * * * the dwelling will be reasonably fit for human habitation").

Finally we note that extension of the common law is unwarranted in light of recent state and federal statutory laws that impose liability running from landowners to subsequent remote purchasers. In Rhode Island, § 46-12-21 does not apply in the instant case because it cannot be applied retroactively. *See supra.* The statute nevertheless imposes a liability running from landowners to future purchasers and anyone else who is harmed by pollution that affects groundwater.

The federal counterpart to § 46-12-21 [**17] is CERCLA. Enacted in 1980, and substantially amended in 1986, Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 (1986), with jurisdiction vested exclusively in the federal court, 42 U.S.C.A. § 9613(b)(West Supp. 1993), CERCLA provides for a remedy to the widespread use and disposal of hazardous substances by ensuring a prompt and an effective cleanup of hazardous-waste disposal sites. *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1455 (9th Cir. 1986). In addition, CERCLA assures that parties responsible for pollution bear the cost of rectify-

ing the conditions they created. Id. This objective is accomplished in part because CERCLA can be applied retroactively. *United States v. Northeastern Pharmaceutical & Chemical Co.,* 810 F.2d 726, 732-34 (8th Cir. 1986), *cert. denied,* 484 U.S. 848, 108 S. Ct. 146, 98 L. Ed. 2d 102 (1987). Thus subsequent purchasers may seek contribution or indemnification from a "responsible party" even if the offensive actions occurred prior to CERCLA's enactment [**18] in 1980.

There are two provisions in CERCLA by which a private individual may seek recovery. Pursuant to 42 U.S.C.A. § 9607(a)(4)(B) private entities may sue "responsible parties" for "any other necessary costs of response incurred by any other person consistent with the national contingency plan." Although "responsible parties" are not specifically permitted to seek recovery under § 9607(a)(4)(B), some courts have found that potentially responsible parties do have standing to pursue private actions. *Pinole Point Properties, Inc. v. Bethlehem Steel Corp.,* 596 F. Supp. 283, 290-91 (N.D.Cal. 1984); *City of Philadelphia v. Stepan Chemical Co.,* 544 F. Supp. 1135, 1142-43 (E.D.P.A. 1982). These courts have permitted such actions as a means of furthering the key objective of [*957] CERCLA -- "to facilitate the prompt clean up of hazardous dumpsites * * * by placing the ultimate financial burden upon those responsible for the danger." *Stepan Chemical Co.,* 544 F. Supp. at 1142-43.

In addition, although liability under CERCLA generally is joint and several, Jeffrey M. Gaba, [**19] *Recovering Hazardous Waste Cleanup Costs: The Private Cause of Action Under CERCLA,* 13 Ecology L.Q. 181, 189 & n.28 (1986), § 9613(f)(1) provides an express right to contribution from "any other person who is liable or potentially liable under section 9607(a)." 42 U.S.C.A. § 9613(f)(1)(West Supp. 1993). Contribution may be sought through a separate cause of action in federal court or, if the party is being sued under CERCLA, through impleading other potentially responsible parties and filing cross- or counterclaims. Id.

Therefore, in the instant action CERCLA provided Hydro with a potential cause of action against Kayser-Roth. [4] Given these factors, we are of the opinion that extending common-law negligence doctrine to create a duty running from a predecessor-in-interest to a remote subsequent purchaser is unwarranted.

4 The doctrine of caveat emptor is not a permissible defense to liability under CERCLA. *Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86, 89-90 (3d Cir. 1988), *cert. denied,* 488 U.S. 1029, 109 S. Ct. 837, 102 L. Ed. 2d 969 (1989). However, a court may use equitable factors, such as caveat emptor, in determining the amount of the award in a CERCLA suit. 851 F.2d at 89; 42 U.S.C.A. § 9613(f)(1) (West Supp. 1993).

[**20] PRIVATE AND PUBLIC NUISANCE

In its amended complaint Hydro asserted that Kayser-Roth's actions gave rise to a cause of action sounding in nuisance. Relying primarily on *Wood v. Picillo,* 443 A.2d 1244 (R.I. 1982), Hydro contended that contamination of the site by Kayser-Roth's subsidiary created both a private and a public nuisance for which it must be held liable.

Private and public nuisances are two distinct causes of action relating to the unreasonable interference with the use and enjoyment of land. Historically the law of private nuisance has been applied to conflicts between neighboring, contemporaneous land uses. *Philadelphia Electric Co.,* 762 F.2d at 314 & n.9; *Wellesley Hills Realty Trust,* 747 F. Supp. at 98. Under Rhode Island law it is well settled that a cause of action for a private nuisance "arises from the unreasonable use of one's property that materially interferes with a *neighbor's* physical comfort or the neighbor's use of his real estate." (Emphasis added.) Weida v. Ferry, 493 A.2d 824, 826 (R.I. 1985). *Accord Citizens for Preservation of Waterman Lake v. Davis,* 420 A.2d 53, 59 (R.I. 1980). [**21] The offensive condition therefore must originate outside the plaintiff's land, *Wilson Auto Enterprises, Inc.,* 778 F. Supp. at 106; *Wellesley Hills Realty Trust,* 747 F. Supp. at 98, in contrast to the instant action, in which Hydro seeks recovery for conditions originating from its own property. Hydro, the vendee of property whose conditions vendor Kayser-Roth allegedly created, claimed that the contamination has interfered with its use of that property. Under common law, a current owner cannot assert a private-nuisance claim against a prior owner for contamination that occurred before the sale. *Philadelphia Electric Co.,* 762 F.2d at 314-15; *Wilson Auto Enterprises, Inc.,* 778 F. Supp. at 106; Wellesley Hills Realty Trust, 747 F. Supp. at 98-99; *Amland Properties Corp. v. Aluminum Company of America,* 711 F. Supp. 784, 808 & n.24 (D.N.J. 1989); *Sheehy v. Lipton Industries, Inc.,* 24 Mass. App. Ct. 188, 191-92, 507 N.E.2d 781, 783 (1987). Accordingly, Hydro is precluded [**22] from pursuing a private-nuisance action against its predecessor-in-interest, Kayser-Roth.

Unlike a private nuisance where there is an invasion of another's interest in the private use and enjoyment of land, a public nuisance is an "unreasonable interference with a right common to the general public." *Citizens for Preservation of Waterman Lake,* 420 A.2d at 59. Not everyone affected by a public nuisance, however, has standing to pursue an action to recover damages created by the nuisance. Only private individuals who "'suffer[]

special damage, distinct from that common to the public'" may maintain an action for a public nuisance. [*958] *Iafrate v. Ramsden,* 96 R.I. 216, 222, 190 A.2d 473, 476 (1963). *Accord Radigan v. W. J. Halloran Co.,* 97 R.I. 122, 128, 196 A.2d 160, 163 (1963). To meet the "special damage" requirement, the individual "must have suffered harm of a kind different from that suffered by other members of the public *exercising the right common to the general public that was the subject of interference."* (Emphasis added.) 4 Restatement (Second) *Torts* [**23] § 821C(1) (1979).

The "special damage" that Hydro is alleged to have suffered is the loss of the use and/or value of the land forfeited in settlement of the CERCLA action. Hydro, however, has not suffered this "special damage" in the exercise of a right common to the general public. The public right that has been interfered with by the contamination of the land is the right to pure water. Hydro did not allege that it suffered special damages stemming from Kayser-Roth's interference with Hydro's use and enjoyment of the groundwater at the site or of its right to pure water. *See Mayor and Council of Rockaway v. Klockner & Klockner,* 811 F. Supp. 1039, 1056-57 (D.N.J. 1993). Hydro, rather, maintained that it suffered pecuniary harm in the forfeiture of the land. The CERCLA action that resulted in forfeiture of the land was brought against Hydro because of Hydro's status as current owner of the contaminated land. Therefore, the alleged damages suffered by Hydro were in Hydro's exercise of its private-property right, not in the exercise of a public right. See *Philadelphia Electric Co.,* 762 F.2d at 316. Thus, because Hydro's harm [**24] was not suffered in the exercise of a right common to the general public, Hydro lacks standing to pursue a public-nuisance action.

ABNORMALLY DANGEROUS ACTIVITIES AND FAILURE TO DISCLOSE

In two other counts, Hydro alleged that Kayser-Roth should be liable for having conducted an abnormally dangerous activity and for having failed to disclose dangerous conditions at the site. We are of the opinion that Hydro has failed to establish a cause of action under either of these counts.

First, in regard to maintaining an abnormally dangerous activity, if we assume arguendo that Rhode Island recognizes such a cause of action [5] and that Kayser-Roth's activity amounted to an abnormally dangerous one, Hydro has failed to state a claim for strict liability. The Restatement (Second) of Torts provides that "one who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels *of another* resulting from the activity." (Emphasis added.) 3 Restatement (Second) *Torts* § 519 (1977). At the time Stamina committed the offensive activity, Stamina owned the property. Thus, Stamina caused harm to property *it owned.* After the contamination, the site [**25] became the property of Hydro. Hydro therefore did not bring this claim as an injured adjoining landowner or visitor on Kayser-Roth's property. Thus Hydro has failed to state a cause of action for the maintenance of an abnormally dangerous activity. *Wellesley Hills Realty Trust,* 747 F. Supp. at 102. *Accord Futura Realty v. Lone Star Building Centers (Eastern), Inc.,* 578 So. 2d 363, 365 (Fla. Dist. Ct. App. 1991).

> 5 This court has declined to adopt the rule of strict liability for abnormally dangerous activity enunciated in *Rylands v. Fletcher,* [1868] L.R. 3 E & I App. 330. *Rose v. Socony-Vacuum Corp.,* 54 R.I. 411, 416, 173 A. 627, 629 (1934). Without expressly overruling Socony-Vacuum on this issue, however, we subsequently noted that an individual may arguably be held strictly liable for maintaining an abnormally dangerous activity. *Wood v. Picillo,* 443 A.2d 1244, 1249 n.7 (R.I. 1982). Nevertheless, we did not expressly adopt the doctrine of abnormally dangerous activity in Wood, and in like manner, we are of the opinion that the instant case does not warrant the adoption of the doctrine at this time.

[**26] Hydro has also failed to state a cause of action as a consequence of failure to disclose a dangerous condition of the land. As we noted *supra,* a recognized exception to the doctrine of caveat emptor is the duty imposed on a vendor to disclose to a vendee any hidden defects it knows or should know would create an unreasonable risk of harm to others. See G.L. 1956 (1987 Reenactment) § 5-20.8-2, as amended by P.L. 1993, ch. 397, § 4. But, this exception to the doctrine of caveat emptor does not apply here.

[*959] Stamina, Kayser-Roth's subsidiary, sold the property to Meunier. Thus, if one assumes that there is a dangerous condition creating an unreasonable risk of harm that Stamina had a duty to disclose, then that duty would run to Meunier, not to Hydro. Hydro nevertheless asks this court to extend the doctrine to create a duty running from vendors to subsequent remote vendees. We decline to expand the common law to accommodate Hydro's claim here, noting that a potential cause of action may be brought in federal court under CERCLA.

Hydro's final claim on appeal was that Kayser-Roth would be unjustly enriched if Hydro were prevented from seeking damages in the instant suit. Our review [**27] of the record, however, revealed that Hydro did not advance a theory of unjust enrichment in the Superior Court proceedings. It is well settled that a party may not "'advance new theories or raise new issues in order to

secure a reversal of the lower court's determination.'" *Nedder v. Rhode Island Hospital Trust National Bank,* 459 A.2d 960, 963 (R.I. 1983)(quoting *Ludwig v. Kowal,* 419 A.2d 297, 302 (R.I. 1980)). Thus, because this argument was raised for the first time on appeal, we decline to consider it. *Nedder,* 459 A.2d at 963.

Accordingly, for the foregoing reasons we deny and dismiss the appeal. The judgment appealed from is affirmed.

LEXSEE 443 A.2D 1244

**W. Edward Wood et al. v. Warren V. Picillo et al.**

**No. 80-419-Appeal**

**Supreme Court of Rhode Island**

**443 A.2d 1244; 1982 R.I. LEXIS 833; 17 ERC (BNA) 1386; 12 ELR 21000**

**April 9, 1982**

**COUNSEL:** [**1] Dennis J. Roberts II, Attorney General, Daniel J. Schatz, Special Assistant Attorney General, For Plaintiffs.

Charles J. Rogers, Jr., Providence, For Defendants.

**JUDGES:** Weisberger, J., wrote the opinion. Bevilacqua, C.J., Kelleher, Weisberger, Murray, JJ., concurring. Shea, J., not participating.

**OPINION BY:** WEISBERGER

**OPINION**

[*1245] This is an appeal from a judgment of the Superior Court entered after trial without the intervention of a jury. Finding that the defendants created a public and private nuisance in maintaining a hazardous waste dump site on their Coventry farm, the trial justice enjoined further chemical disposal operations at the defendants' property and ordered the defendants to finance cleanup and removal of the toxic wastes. The defendants now contend that the trial justice erred in finding the disposal operation to be a public and private nuisance. We strongly disagree. Accordingly, the judgment of the Superior Court is affirmed. [1]

1 Although there are multiple parties to this action and all claims have not yet been resolved, the trial justice determined that there was no just reason for delay of entry of judgment against the present defendants. Certification pursuant to Super. R. Civ. P. 54(b) was entered *nunc pro tunc* on January 14, 1982.

[**2]

The testimony elicited during the extensive hearings conducted on this case revealed the following dramatic events. On September 30, 1977, an enormous explosion erupted into fifty-foot flames in a trench on defendants' Coventry property. Firefighters responded to the blaze but could not extinguish the flames. As the fire raged within the trench, additional explosions resounded. From the conflagration billowed clouds of thick black smoke that extended "as far as the eye could see on the Eastern horizon."

Not unexpectedly, the extraordinary blaze aroused the interest of various state officials. The state fire marshal declared the dump site a fire hazard and ordered defendants to cease disposal activity and to remove all flammable wastes. Personnel from the Department of Environmental Management (DEM) also investigated the dumping operation, conducting soil, water, chemical, and topographical analyses of defendants' property and adjacent areas. Despite the fire marshal's order and the ongoing official investigations, the dumping and burying of chemical wastes continued.

A general description of the Picillo property and adjacent lands is helpful in evaluating the evidence. According [**3] to the testimony of various witnesses, the Picillos owned acreage on Piggy Hill Lane in Coventry, Rhode Island. Piggy Hill Lane, which serves only the Picillos' property, is a winding dirt road running from Perry Hill Road. Near the entrance of the property defendants maintain pigs, and two houses are also located in this general area. A three to five-acre clearing in once-wooded [*1246] land lies approximately 800 feet uphill from the two homes. It is this clearing that houses the chemical dump site. About 600 feet downhill to the north-northwest of the clearing is a marshy wetland. The wetland is part of the Quinabog River Basin; the wetland waters drain in a gradual southwesterly flow into the Quinabog River, Wickford Pond, the Roaring Brook, and Arnold Pond. These fish-inhabited waters are utilized both by the general public and by a commercial cranberry grower.

The dump site proper might best be described in the succinct expression of the trial justice as "a chemical nightmare." John Quinn, Jr., chief of the DEM's solid-

waste management program, visited defendants' property on October 13, 1977 and testified to what he saw. Quinn stated that at one side of the clearing [**4] lay a huge trench which he estimated to be 200 feet long, 15 to 30 feet wide, and 15 to 20 feet deep. A viscous layer of pungent, varicolored liquid covered the trench bottom to a depth of six inches at its shallowest point. Along the periphery of the pit lay more than 100 fifty-five gallon drum-type and five-gallon pail-type containers. Some of the containers were upright and sealed, some tipped, and some partially buried; some were full, some partially full, and some empty. An official from the state fire marshal's office also visited the dump site. He testified that on October 15, 1977, he observed a truck marked "Combustible" offloading barrels of chemical wastes. The truck operator knocked the barrels off the truck's tailgate directly onto the earth below, and chemicals poured freely from the damaged barrels into the trench. In 1979 state officials discovered a second dump site when "sink holes" emitting chemical odors opened in the earth at some distance from the previously described pit.

Several witnesses testified at trial to the immediate and future effects of the chemical presence. Neighbors of the Picillos reported that in the year preceding the fire, tractor-trailer [**5] traffic to and from defendants' property greatly increased. According to the testimony many of the trucks bore "Flammable" warnings and the name of a chemical company. The neighbors also testified that on several occasions during the summer of 1977 pungent odors forced them to remain inside their homes. The odors were described variously as "sickening," "heavy," "sweet," "musky," "terrible," and like "plastic burning." One neighbor testified that the odors induced in her severe nausea and headaches, while another stated that on one occasion fumes from the Picillo property caused her to cough severely and to suffer a sore throat that lasted several days.

At trial expert witnesses developed a scientific connection between the neighbors' experiences and the Picillos' operations. Laboratory analyses of samples taken from the trench, monitoring wells, and adjacent waters revealed the presence of five chemicals: toluene, xylene, chloroform, III trichloroethane, and trichloroethylene. [2] Doctor Nelson Fausto, a professor of medical sciences in the pathology division of the Department of Biological and Medical Sciences at Brown University, described the toxic effects of the five discovered [**6] chemicals. Doctor Fausto testified that chloroform is a narcotic and an anesthetic that will induce vomiting, dizziness, and headaches in some persons exposed to it. Trichloroethane and trichloroethylene, according to Dr. Fausto, are similar to chloroform in chemical structure and in toxic effect. Toluene and xylene are also toxins, Dr. Fausto testified, that may cause irritation of the mucous membranes in the upper respiratory tract.

2 These were the only chemicals for which tests were conducted.

Doctor Fausto explained that the chemicals in question also exert chronic or long-term effects on animals and humans. According to the professor, chloroform, trichloroethane, and trichloroethylene are strong carcinogens that cause cirrhosis (cell death) of the liver and hepatoma (cancer of the liver). Doctor Fausto asserted that there is no safe level of human or animal exposure to these chemicals. Regarding toluene and xylene, Dr. Fausto testified [*1247] that neither is as yet known to be carcinogenic, [**7] but both exert a toxic effect on bone marrow, causing anemia in susceptible persons. Additionally, Dr. Fausto stated, the presence of chloroform in areas where it might be heated presents further potential danger. Heated to sixty-eight degrees Fahrenheit, chloroform converts to phosgene gas, a nerve gas of the type utilized in World War I. Doctor Fausto stated that direct sunlight would provide sufficient heat to turn chloroform present in surface water into phosgene.

According to the experts, the chemicals present on defendants' property and in the marsh, left unchecked, would eventually threaten wildlife and humans well downstream from the dump site. Mr. Frank Stevenson, the principal sanitary engineer for the DEM, and Dr. William Kelly, an Associate Professor of civil and environmental engineering at the University of Rhode Island, testified as experts in soil mechanics and groundwater hydrology. The experts established that the soil at the dump site consisted of an unstratified composition of sand, gravel, and silt of varying sizes. The permeable nature of this soil would allow any liquid or chemical in or on it to percolate down to the water table and to travel with the [**8] groundwater in a northerly flow. The opinion of the experts was buttressed by the documented presence of toluene, xylene, chloroform, trichloroethane, and trichloroethylene in the northern marsh and in several monitoring wells. [3] The only possible source of the pollutants, according to Dr. Kelly, was the Picillo dump site.

3 The chemicals were detectable not only through laboratory processes but also by gross visual inspection. Experts reported a reddish discoloration and an oily surface in one section of the wetland, along with a pungent chemical odor. Doctor Kelly stated also that at one location chemicals seeped out of the ground as if from a spring.

Expert testimony further revealed that the chemicals had traveled and would continue to travel from the dump

site into the marsh at the rate of about one foot per day. From the marsh, predicted the experts, the chemicals would flow in a southwesterly direction into the Quinabog River and its tributaries Moosup River and Roaring Brook, and Wickford Pond. [**9] These waters are inhabited by fish and used by humans for recreational and agricultural purposes.

On these and other facts the trial justice determined the dump site to be a public and private nuisance. He found also that the current danger to the public health and safety posed by the chemical presence would worsen unless effective remedial action was quickly taken. The trial judge thus permanently enjoined disposal operations on defendants' property and ordered that all chemicals and contaminated earth be removed to a licensed disposal facility. Because defendants had in the past displayed an unwillingness or inability to remedy the danger, the Superior Court justice authorized plaintiffs to effectuate cleanup of defendants' property at defendants' expense.

The defendants contend that the evidence adduced at trial was insufficient to support a finding of public and private nuisance. The defendants point to two alleged evidentiary inadequacies: (1) that plaintiffs failed to establish any significant injury to persons or to natural wildlife and (2) that plaintiffs failed to meet their obligation to show that defendants acted negligently in disposing chemical wastes on their property. [**10] We find both assertions to be without merit.

The essential element of an actionable nuisance is that persons have suffered harm or are threatened with injuries that they ought not have to bear. *Citizens for Preservation of Waterman Lake v. Davis*, R.I. , , 420 A.2d 53, 59 (1980). Distinguished from negligence liability, liability in nuisance is predicated upon unreasonable injury rather than upon unreasonable conduct. *Braun v. Iannotti*, 54 R.I. 469, 471, 175 A. 656, 657 (1934). Thus, plaintiffs may recover in nuisance despite the otherwise nontortious nature of the conduct which creates the injury. *Id.*

[*1248] In his brief defendant has accurately stated that the injury produced by an actionable nuisance "must be real and not fanciful or imaginary * * *." *See generally Blomen v. N. Barstow Co.*, 35 R.I. 198, 205, 85 A. 924, 926 (1913); Prosser, *Handbook of the Law of Torts* § 87 at 577 (4th ed. 1971). The defendant next suggests that the injuries in the case at bar are of the insubstantial, unactionable type. It is this statement, however, rather than the purported injuries, that is fanciful. The testimony to which reference is made in this [**11] opinion clearly establishes that defendants' dumping operations have already caused substantial injury to defendants' neighbors and threaten to cause incalculable damage to the general public. The Picillos' neighbors have displayed physical symptoms of exposure to toxic chemicals and have been restricted in the reasonable use of their property. Moreover, expert testimony showed that the chemical presence on defendants' property threatens both aquatic wildlife and human beings with possible death, cancer, and liver disease. Thus, there was ample evidence at trial to support the finding of substantial injury implicit in the trial justice's finding of public and private nuisance. [4]

4 On appeal our review of the trial justice's findings is very limited. We must uphold the trial justice's factual findings unless they are clearly wrong or unless the trial justice overlooked or misconceived material evidence. *Citizens for Preservation of Waterman Lake v. Davis*, R.I. , , 420 A.2d 53, 59 (1980); *Pucci v. Algiere*, 106 R.I. 411, 424, 261 A.2d 1, 9 (1970).

[**12]

The defendants' remaining contention is that Rhode Island case law requires plaintiffs to prove negligence as an element of the nuisance case and that plaintiffs failed to do so. [5] Generally, this court has not required plaintiffs to establish negligence in nuisance actions. [6] *See Citizens for Preservation of Waterman Lake v. Davis*, R.I. , 420 A.2d 53 (1980); *Pucci v. Algiere*, 106 R.I. 411, 261 A.2d 1 (1970); *Rose v. Standard Oil Co.*, 56 R.I. 272, 185 A. 251 (1936); *Braun v. Iannotti*, 54 R.I. 469, 175 A. 656 (1934); *Blomen v. N. Barstow Co.*, 35 R.I. 198, 85 A. 924 (1913). In one case, however, the Rhode Island Supreme Court refused to impose nuisance liability upon an oil refining company absent proof of negligence. *See Rose v. Socony-Vacuum Corp.*, 54 R.I. 411, 421, 173 A. 627, 631-32 (1934). The defendant asserts that the *Rose* case is apposite to and controls the case at bar. We disagree.

5 Although it may be that a finding of negligence is implicit in the trial judge's nuisance determination, the rescript contains no indication of a specific finding of negligence.

[**13]

6 In *Braun v. Iannotti*, 54 R.I. 469, 471, 175 A. 656, 657 (1934), the court wrote:

> "'In cases of damage by nuisance it is considered that the injurious consequences resulting from the nuisance, rather than the act which produces the nuisance, is the cause of action * * *. Negligence of the

> defendant is not, ordinarily, an element.'"

> Whether or not a nuisance is actionable absent proof of negligence depends upon the nature of the nuisance and the facts of the particular case. *Rose v. Standard Oil Co.*, 56 R.I. 272, 279-80, 185 A. 251, 254-55 (1936).

The facts of *Rose* are somewhat similar to the facts of the present case. The plaintiff, Manuel Rose, owned a fifty-seven-acre farm in East Providence, Rhode Island, on which he maintained a piggery and hennery. Rose drew drinking water for his family and for the hens from a freshwater well dug on the property, and the pigs drank from a stream that traversed the farm. The well and the stream were fed by waters that percolated from an underground source.

The defendant in *Rose* was the owner of a large oil refinery [**14] and several storage tanks situated directly across the street from the plaintiff's farm. The refinery and the storage tanks discharged and leaked petroleum, gasoline, and waste products into basins, streams, and ponds on the defendant's property. These substances, however, did not remain in their natural repositories. Rather, the oil products percolated through the soil into the groundwater and discharged into the plaintiff's well and stream. The pollutants contaminated the plaintiff's drinking water, killing 700 hens and 75 breeding sows. The plaintiff instituted [*1249] suit against Socony-Vacuum, alleging private nuisance but not negligence.

The Superior Court sustained defendant's demurrer. On appeal, the Supreme Court framed the issue in the following terms:

> "While the defendant could appropriate to its own use the percolating waters under its soil -- providing that in so doing it was not actuated by an improper motive and was not negligent -- can it, by the use to which it puts its land, deprive the plaintiffs of such waters by rendering them unfit for plaintiffs' use by contamination?" 54 R.I. at 418-19, 173 A. at 630.

The court held that the defendant [**15] could with impunity contaminate the plaintiff's drinking water if the defendant polluted nonnegligently. *Id.* at 421, 173 A. at 631-32. The court reasoned that because "courses of subterranean waters are * * * indefinite and obscure," rights to them are less easily definable than riparian rights to surface streams. Suggesting that it might be unjust to subject landowners to liability for the unforeseeable consequences of legitimate land uses, the court looked to the teaching of other courts that had considered the issue. Examination of the cases disclosed a split of authority; jurisdictions with primarily agricultural economies imposed nuisance liability without proof of negligence, whereas jurisdictions with primarily industrial economies required a negligence showing. The *Rose* court determined that petroleum products were vital to the highly developed industrial economy of the local area, and held as a matter of policy that injury of the type occasioned by the defendant's percolating pollutants was, absent negligence, "*damnum absque injuria.*" *Id.*

Since this court decided *Rose v. Socony-Vacuum* in 1934, the science of groundwater hydrology as well as societal [**16] concern for environmental protection has developed dramatically. As a matter of scientific fact the courses of subterranean waters are no longer obscure and mysterious. The testimony of the scientific experts in this case clearly illustrates the accuracy with which scientists can determine the paths of groundwater flow. Moreover, decades of unrestricted emptying of industrial effluent into the earth's atmosphere and waterways has rendered oceans, lakes, and rivers unfit for swimming and fishing, rain acidic, and air unhealthy. Concern for the preservation of an often precarious ecological balance, impelled by the spectre of "a silent spring," has today reached a zenith of intense significance. Thus, the scientific and policy considerations that impelled the *Rose* result are no longer valid. We now hold that negligence is not a necessary element of a nuisance case involving contamination of public or private waters by pollutants percolating through the soil and traveling underground routes. [7]

7 It could well be argued that one who utilizes his land for abnormally dangerous activities or for storage of abnormally dangerous substances may be strictly liable for resultant injuries, even in the absence of a finding of nuisance or negligence. *See Rylands v. Fletcher*, [1868] L.R. 3 E & I App. 330; Prosser, *Handbook of the Law of Torts* § 78 at 505-16 (4th ed. 1971). In the case at bar the finding of both private and public nuisance makes it unnecessary to consider the doctrine of strict liability.

[**17]

For the reasons stated, the defendants' appeal is denied and dismissed. The judgment of the Superior Court is affirmed. The papers in the case may be remanded to the Superior Court.

Mr. Justice Shea did not participate.