MR. ROSS: Objection to form.
MR. ORENT: Let me rephrase it.
BY MR. ORENT:
Q. At some period early in the 1900's, stone Webster managed the Charles Street facility; is that right; is that your understanding?
MR. ROSS: If you know.
A. Yeah my understanding is from some period in the early to mid-1900's, subsequently stone and Webster was operating certain facilities for the Fall River Gas company, yes.
Q. My question to you is, did they maintain separate records for the operations during the period in which they managed the facility or would those operational records be maintained within what you produced to us?
A. I'm not sure I understand the question.
Q. Okay. Let me break it down. At some point and I'm not trying to be coy with you. Stone and Webster manage the Charles Street facility would you agree with that?
A. For a certain period of time that's my understanding, yes.
Q. And documents are produced in the daily course



of business isn't that also correct?
MR. ROSS: At the Fall River Gas company during the time they occurred.
MR. ORENT: Yes.
A. You mean documents created.
Q. Documents are created as a normal part of business?
A. Generally yes.
Q. Records, et cetera?
A. Yes.
Q. Many of these records appear in the boxes that you have also provided us isn't that also right?
MR. ROSS: Objection to form, vague.
A. It's my understanding that there are some Webster documents in the 400 some odd boxes.
Q. My question to you is documents that discussed the praises of Fall River Gas during that period in which they were managed by stone and Webster, did stone and Webster keep a separate set of records or would all of the complete set be what we have here that you produced to us?
A. I think that's beyond the scope of what I'm prepared to talk about. I don't know.
Q. Aside from capital, are there other locations



throughout the country where New England Gas Company stores documents?
MR. ROSS: Related to the Fall River Gas company operations?
MR. ORENT: In general.
MR. ROSS: Objection to form and relevance recognizing -- go ahead if you know.
A. They may well have some records that are located in places other than New England, but my understanding is that all the records related to the Fall River Gas operations, are -- were located at Capital Records.
Q. Out of 417 boxes you said have been made available to us, were any documents removed from those boxes before they were released to us by us I mean the plaintiffs in this case?
MR. ROSS: Are you asking whether responsive materials were removed or nonresponsive?
MR. ORENT: I'm asking if any documents were removed prior to the plaintiffs' review of these boxes.
MR. ROSS: Regardless of responsiveness?
A. Yeah, I don't know.
Q. Who would know?



A. Counsel.
Q. Aside from talking to Miss Ann Connor, who else did you consult regarding the location of any boxes?
MR. ROSS: Objection to form. He did not testify that he consulted with Ann Connor. He testified that Ann Connor consulted with counsel. You want to rephrase?
BY MR. ORENT:
Q. How long did you talk to David Black regarding your testimony today?
A. Oh, a few minutes.
Q. Okay. What topics did you discuss with him?
A. We discussed information about the Louie dread did I matter.
Q. Angle what in particular did you discuss regarding that matter?
A. We discussed the fact that the company knows of no one who has information relative to what documents were produced in that matter.
Q. Do you have information as to the documents that were produced in the Corey lane matter?
A. That's the Louie dread did he matter I assume.
Q. And it's your understanding that no one at the

41

company has any awareness as to what documents were produced in that matter?
A. That's correct.
Q. Okay.
Q. What did you discuss with counsel in preparation for today's deposition?
A. I discussed the nature of the deposition or the deposition notices and we discussed what documents had been -- or how documents had been generally retrieved by counsel and reviewed for presentation to the plaintiffs.
MR. ROSS: Obviously I don't want you to go to into the specifics of the conversation, but I don't have a problem with the general description.
Q. Are you aware of any additional requests for production that were made to the defendant after the issuance of that letter in January, 2007?
A. I'm not aware of the individual requests for production, just the materials that were produced.
Q. Okay. Are you aware of any criteria changes that occurred between the period of January 2007 when you first made 368 boxes available, and some period in 2008, where some additional boxes became available to the plaintiffs?

42

MR. ROSS: Objection to form.
A. My understanding is that the criteria for producing materials remained the same. Documents that were responsive to plaintiffs' requests and non-privileged.
Q. And what constitutes responsive in your analysis?
MR. ROSS: Objection to form; an assumption he did any analysis. He's repeating the process.
A. The response would be what basically every lawyer understands is a document that is -- responds to the request that's being asked.
Q. Do you have any awareness of any of the contents of 417 boxes you said have been made available to us?
A. No, I have not reviewed any of the boxes.
Q. So you're not prepared to testify as to the contents of any of those boxless; is that right?
MR. ROSS: Objection, objection just note that the basis for the objection has been previously stated in the objection that we'll served and which you marked at this deposition.
A. I have not reviewed any of the individual boxes, my understanding is that all documents that are

43

responsive to the plaintiffs' requests and the documents related to the operations of the Fall River Gas facilities are included in those 417 boxes, but I haven't reviewed any individual documents, no.
Q. Have you reviewed any of the individual requests for production in this case?
A. I'm trying to think. Other than responding to the subpoena, the notices, no.
Q. By notices you mean the notices for today's deposition?
A. Today, as well as the 30(b)(6) that was previously taken in this case of myself.
Q. Okay.
Q. And you don't have specific dates for which the search was conducted or the identification of these 417 documents; is that correct?
A. My understanding.
MR. ROSS: Objection; asked and answered.
A. My understanding is that the search started in January of 2006 and continued to 2008.
Q. Approximately how many hours a week were used in searching for these documents?
A. I don't know.
MR. ROSS: Objection to form.

44

Q. Okay. Let's take these box by box. Do you know when the first box was located?
A. No.
Q. Box No. 1?
A. No.
Q. How about box No. 2?
A. No.
Q. Do you know the date at which any particular box was identified?
A. No.
Q. Do you know how many boxes per week were identified by the -- by counsel?
MR. ROSS: Objection assumes there were an equal number per week that were identified.
A. No, I don't know when the exact boxes were identified.
Q. Okay. Do you know whether or not box 417 was in fact -- strike that. You aren't able to say whether or not box 417 was in fact located before or after box No. 1, are you?
MR. ROSS: Objection to form.
A. I can't say exactly when any box was specifically identified and located.
Q. Do you know how the boxes were numbered?

A. No, I don't.
Q. Have you ever seen any of these boxes?
A. No, I have not.
Q. Have you spoken with any of the individuals who conducted the search?
A. No, I haven't, as far as I know.
Q. Have you read any reports of individuals who conducted searches for the box?
MR. ROSS: Assumes there were reports. Assumeses facts not in evidence, objection?
A. No, I haven't seen any reports.
Q. Were you able to identify whether or not those who conducted the search took know?
A. No, I don't know whether anyone took notes.
Q. Did anyone log what boxes they reviewed at specific time? Is there a log?
A. I can't say.
Q. You don't know?
A. If a review was conducted by counsel and I don't know the specific details of the review.
Q. At Capital Records, did you have to fill out any paperwork to get any of the boxes?
A. I don't know exactly the details of rereferring to the boxes from Capital Records.



Q. Okay.
Q. Do you know who the individuals were that searched through the boxes?
A. No, I don't.
Q. Okay. Do you know how many hours were spent looking in boxes?
A. I think we've covered this. No.
Q. Do you know when the last box was identified?
A. No, I don't.
Q. How long did it take to locate that first box after you began your search?
A. I don't know.
Q. Were there any breaks taken for a period of days or weeks during the investigation to locate these boxes?
MR. ROSS: Objection to form.
A. Yeah, I -- I can't say -- talk to the details of the review of the boxes.
Q. Well, did they go every day for searching for boxes?
A. I think I just answered that question --
MR. ROSS: Objection --
Q. It was a different question.
A. I can't talk to the details of the review of



any of the boxes.
Q. Did your lawyers need your permission to go and look at these documents at Capital Records?
MR. ROSS: Objection.
A. Did they need our permission?
Q. Did they have to sign any authorization or anything like that?
A. As far as the mechanics of the retrieval of the documents, I can't speak to that.
Q. Does Southern Union maintain a records retention policy -- record retention policy?
A. I came here to talk to specifically about New England Gas Company records retention policies. I'm not prepared to talk about Southern Union --
Q. Well, I'm wondering does New England Gas follow the Southern Union policies?
MR. ROSS: Objection to form.
A. New England Gas Company has no written policy with respect to the maintenance of the Fall River Gas records other than at a search for those records and it's going to retain those records.
Q. Were any of those records ever destroyed?
MR. ROSS: By New England Gas Company since it acquired the Fall River Gas Company?



MR. ORENT: Yeah.
A. Not to our knowledge.
Q. Have there ever been any floods --
A. No.
Q. -- destroying records?
A. I don't know.
Q. Any fires in warehouses that destroyed any records?
A. Don't know.
Q. Were there any wholesale purges of records at any point after -- strike that. Are you aware at any time of any intentional purges of records from the Fall River Gas company?
MR. ROSS: Three question ago the witness testified that New England Gas Company has not destroyed any of the documents. You're asking now purging is that something dinner than destruction.
MR. ORENT: Throwing them out.
MR. ROSS: So would you define that differently than destruction.
MR. ORENT: I would.
MR. ROSS: Okay with that explanation can you answer.
A. Yes, we're not aware of any intentional

purging of documents from New England Gas Company.
Q. Okay.
Q. You've been a 30(b)(6) deponent in other cases; is that right?
A. I don't believe so.
Q. So the only two 30(b)(6)s you've done are this one and the stone & Webster?
A. That's the best I recall.
MR. ROSS: When you say stone and Webster, you mean in connection with the plaintiff's deposition of New England Gas Company --
MR. ORENT: That's right.
MR. ROSS: -- regarding stone and Webster's issues?
MR. ORENT: That's correct.
A. I believe that's the sum total.
Q. Are you being paid separately for your work in this case or are you being compensated as part of your regular compensation?
MR. ROSS: Objection; absolutely has nothing to do with the notice in this case.
MR. ORENT: Goes to the witness' credibility.
MR. ROSS: It does? I don't see how it could. In any event, he's a current employee of Southern



Union Company or its division.
I can't think of any conceivable explanation as to why --
MR. ORENT: You can answer.
MR. ROSS: -- this answer is relevant, but I'll let you answer any way.
A. Yeah, I'm not sure how the division of my time is allocated among the organizations. I take a stab at it periodically from time to time and to try to make sure it's relatively accurate to the time I spend.
Q. Do you bill separately for your work in conjunction with this case?
A. I don't.
Q. Okay. Do you know --
A. I don't bill for my work. The way we work things, I allocate my time based upon how I think the time is spent among the different family of companies.
Q. And how many hours have you allocated for your work in this case?
A. Oh, I haven't specifically allocated any hours for work in this case.
Q. Do you intend to?
A. I don't know.
Q. How many hours have you in total spent working



on this case?
MR. ROSS: Are you talking about for this deposition?
Q. We'll start with this deposition.
MR. ROSS: Including travel time?
A. I'll add it including time on the road, you're talking at least several days.
Q. How many hours of actual work time, excluding travel, have you spent in preparation for this deposition?
A. I'll take that as how much time have I spent preparing for this deposition, excluding the time I have been traveling? And traveling was about a day, so probably a couple of man days.
Q. And what types of things did you do during that time?
A. I reviewed the notices. I spoke with David Black, I met with counsel, had conferences with with counsel. And once reviewed the index and took a look at the notice of objection, and the memorandum and order issued in this case as well.
Q. Did you look at any documents other than the ones you brought?
MR. ROSS: And that he's identified?



BY MR. ORENT:
Q. And that you've identified earlier?
A. Yeah, the list I just went through is, I believe, the sum total of materials.
MR. ORENT: Thank you. I have no further questions.
MR. ROSS: All right. Thank you, Mr. Soldano.
THE WITNESS: Thank you.
THE VIDEOGRAPHER: The time is 3:13 p.m., April 15, 2008.
This is the end of tape one and completes the videotaped deposition of Louis Soldano.
MR. ROSS: Copy, rough and regular time.
MR. ORENT: Rough and regular time.